## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        :
RONALD BURNS,                           :
                                        :
            Petitioner,                 :        Civ. No. 13-1929 (RBK)
                                        :
      v.                                :        **OPINION**
                                        :
CHARLES E. WARREN, et al.,              :
                                        :
            Respondent.                 :
_____ :

**ROBERT B. KUGLER, U.S.D.J.**

### I.     INTRODUCTION

Petitioner is a state prisoner and is proceeding *pro se* with a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his New Jersey State court convictions of first

degree murder, second degree possession of a weapon for an unlawful purpose, and third degree

hindering apprehension.  The named Respondents are Charles E. Warren and the Attorney

General for the State of New Jersey.  For the following reasons, the habeas petition will be

denied.[1]

_____

[1] To the extent that Petitioner's claims are unexhausted, this Court will deny them on the merits
pursuant to 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied
on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in
the courts of the State."). *See Carrascosa v. McGuire*, 520 F.3d 249, 255 n.10 (3d Cir. 2008)
("There is, however, a difference between granting an unexhausted habeas claim on the merits
and denying such a claim on the merits, as recognized by the plain language of section
2254(b)(2) . . . Denying an unexhausted claim on the merits is consistent with the statute.");
*Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of Taylor's
claims on the merits, we need not address exhaustion."); *Bronshtein v. Horn*, 404 F.3d 700, 728
(3d Cir. 2005) ("We would permit *Bronshtein* to attempt on remand to establish a reason to
excuse his procedural default, but we find it unnecessary to do so because it is apparent that the
claims in question lack merit.  Under 28 U.S.C. § 2254(b)(2), we may reject claims on the
merits even though they were not properly exhausted, and we take that approach here.").

## II.   FACTURAL AND PROCEDURAL BACKGROUND

The following factual background is taken from the opinion of the New Jersey Supreme

Court's reinstating Petitioner's conviction:

In July 2000, a Burlington County Grand Jury indicted defendant, Ronald Burns[2], with first-degree murder, N.J.S.A. 2C:11–3a(1) and (2) (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39–4a (count two); third-degree unlawful possession of a weapon (handgun), N.J.S.A. 2C:39–5b (count three); and third-degree hindering apprehension of another, N.J.S.A. 2C:29–3a(2) (count four).  Codefendant Tony Felder[3] was also charged in counts one through three of the indictment.

Felder is defendant's first cousin and was eighteen-years old at the time of the incident.  He began selling drugs for defendant when he was fifteen-years old.  Prior to trial, Felder pled guilty to aggravated manslaughter and agreed to testify against defendant.

At trial, the State presented evidence to show that defendant and Ronald Patterson, Jr.[4] were rival drug dealers in Mt. Holly.  Defendant sold drugs from Bobby Bryant's house at 112 Joseph Place, while Patterson sold drugs in front of his cousin's house at 126 Joseph Place.  Because Patterson was selling a better quality of cocaine product, Patterson caused defendant's business to decline.  Defendant was upset with Patterson and, in April 1999, he initially raised the thought of killing Patterson.

On Labor Day, September 6, 1999, Felder was smoking marijuana and watching television in defendant's apartment when defendant said he wanted Patterson dead.  Felder said he would kill Patterson that night.  Defendant had previously given a gun to Bryant and told Felder to use the gun Bryant had in his possession.  Although defendant did not offer to pay Felder for killing Patterson, Felder understood that defendant would protect him after the shooting.

Around 8 p.m., defendant's girlfriend drove defendant and Felder to Bryant's house at 112 Joseph Place where they met Bryant, Tifani Young[5], Lawrence Hightower, and others.  At some point, defendant whispered to Felder, "You gonna kill him?"  Felder responded, "Yeah."  Felder entered Bryant's house to get the gun, but Bryant said he did not have it.  When Felder reported to defendant

---

[2] Ronald Burns, Petitioner, is also known and referred to as "Black."
[3] Anthony Felder, Petitioner's co-defendant, is also known and referred to as "Tone" or "Little Tone."
[4] Ronald Patterson, Jr., the victim, was also known as, and is referred to as, "Bullet."
[5] Tifani Young, Petitioner's cousin and one of the State's witnesses, is also known and referred to as "Fani."

that Bryant did not have the gun, defendant went into the house and returned with the gun. Defendant placed the gun in Felder's left jacket pocket. Because Felder was right-handed, Felder switched the gun to his right pocket.

As Felder started to leave, Young stopped him and asked what he was doing. Defendant told Young to mind his own business. Felder then crossed the street, approached Patterson and his father, and attempted to fire the weapon through his jacket, but the gun failed to discharge. Patterson was unaware of Felder's attempt to shoot him. Felder returned to Bryant's house and told defendant that the gun misfired. Defendant took the gun, removed the clip, unjammed the gun, handed it back to Felder, and told Felder to kill Patterson. Bryant and Hightower saw defendant unjam the gun and hand it back to Felder. Felder again approached Patterson. This time the gun operated. Felder shot Patterson several times before poking him in the head and saying, "I got the last laugh." Patterson's father was nearby and threw a stick at Felder, who fled the scene.

Felder threw the gun in a nearby lake and rode a bike to the location where he had planned to meet defendant. Felder met Young and defendant, who left to get a ride. Young then made arrangements with Curtis Calhoun to drive them to defendant's apartment in Burlington. A short while later, defendant and Young returned in Calhoun's car.

According to Calhoun, he was sitting on a friend's porch that evening when he heard five or six shots. He remained there a short while before leaving. On his way home, Calhoun ran into Young who asked him for a ride, and Calhoun agreed to drive him to Burlington. Calhoun picked up Young and defendant, and drove them to another location to pick up Felder. Calhoun heard Young state that they should have physically fought with Patterson instead of shooting him. Defendant disagreed and told Calhoun to drive to defendant's apartment. At the apartment, defendant exited the car, entered his apartment, and returned with the keys to his girlfriend's car. Young and Felder eventually entered defendant's vehicle, and Calhoun drove away.

Defendant proposed that they go to a strip club in Philadelphia and use that as an alibi. However, before they reached the club, the car had a flat tire. After fixing the flat tire, defendant decided to drive Felder to his grandmother's house. Defendant gave Felder fifty dollars and said he would get back to him in a couple of days.

Bryant testified that following a break-in of his home, defendant gave him a nine-millimeter, semi-automatic gun for protection. Bryant said that shortly before the murder, defendant told him that he needed his gun. Bryant went upstairs, retrieved the gun from under his mattress, put it in his pocket, and returned downstairs. He signaled to defendant that the gun was in his pocket, and defendant removed the gun. Bryant returned inside and did not see what, if anything, defendant did with the gun. A short while later, Bryant saw Felder walk over to where Patterson was standing, remain there about one minute, and return

3

to the group.  Bryant observed Felder huddle with defendant just before defendant unjammed the gun and handed it back to Felder.  Bryant saw Felder walk away and, five minutes later, he heard gunshots.

Hightower was eighteen-years old at the time of the incident.  Hightower testified that he was at Bryant's house on Labor Day when defendant and Felder arrived.  A few minutes later, Young joined them.  Hightower heard defendant say that he wanted Patterson dead.  Fifteen minutes later, Hightower heard Felder ask for a gun.  Hightower saw defendant and Felder follow Bryant into Bryant's house and return a couple of minutes later.  Hightower claimed that Felder walked over to where Patterson and his father were standing, but returned shortly thereafter and said the gun jammed.  Hightower observed Felder as he handed the gun to defendant, who unjammed it and gave it back to Felder. Felder then walked back to Patterson's location.  Hightower next heard shots and saw Patterson's father chasing Felder.

The police were called.  Detective Thomas Mastrangelo testified that when he arrived at the scene the victim's father was distraught.  As Detective Mastrangelo escorted the father to the car, the father accused Felder of shooting his son.  He said that Felder had been with defendant and others at Bryant's house.  Patterson was taken to the hospital where he died from multiple gunshot wounds to the chest and abdomen.

A few days after the murder, Felder met with defendant, Bryant, and another cousin in Philadelphia.  Felder asked for money, and Bryant gave him $700.  Two weeks later, Bryant gave Felder $1000 that he claimed he received from the sale of cocaine that Felder had left at Bryant's house.

When Felder was arrested in Scranton, Pennsylvania, he confessed that he shot Patterson.  Felder consented to allow the State to tape record a telephone call he agreed to make to defendant.  Felder then telephoned defendant.  Felder blamed defendant for his predicament, and asserted that he killed Patterson for defendant and received nothing in return.  Defendant replied that Felder should not be talking like that.  During the conversation, defendant mentioned that Young had told the police the entire story, including that defendant had unjammed the gun.  Felder asked defendant how business was, and defendant replied it was "lovely."

Defendant testified in his defense.  He admitted that he was at Bryant's house on the evening of the shooting, but he denied any involvement in Patterson's death.  He claimed that Felder was already at Bryant's house when he arrived, and that Felder looked "mad" and would not speak to him.  After Felder left the group and walked up Joseph Street, defendant heard gunshots.  Defendant asserted that he never requested nor encouraged Felder to shoot Patterson.  He further denied that he provided the gun to Felder or that he unjammed it.  The defense tried to blame Bryant for Patterson's death because Bryant disliked Patterson.

*State v. Burns*, 192 N.J. 312, 319-23, 929 A.2d 1041, 1044-47 (2007).

Because the New Jersey Supreme Court's opinion, and much of the instant Petition for writ of habeas corpus, addresses the issue of whether Petitioner was deprived of a fair trial when the trial court permitted a witness to express before the jury that he refused to answer specific questions, this Court provides the following relevant information, which is also taken from the New Jersey Supreme Court's opinion:

> During the police investigation of the shooting, Young gave three statements to the police, each one indicating that he thought defendant told Felder to kill Patterson and that, on the night of the murder, he saw defendant unjam the gun for Felder.
>
> At trial, prior to Young's testimony, the prosecutor told the trial court that within the last three weeks, Young confirmed the truth of his prior statements to the police but refused to speak to the prosecutor in preparation for trial. The prosecutor asked the court if he could treat Young as an adverse witness during questioning. The trial court denied that request. Young was sworn in before the jury and immediately informed the court that he would not testify against defendant or Felder because they were his relatives. Defense counsel requested a sidebar conference. The trial court then instructed the jury that
>
> > the fact that Mr. Young said what he just said should not affect your impartiality one way or the other in this case. Do you understand? There is no inference that you should draw either for the State, against the State, for [defendant] or against [defendant] as a result of what Mr. Young said.
>
> At sidebar, defense counsel explained that he found it problematic that Young mentioned his relationship with defendant. The prosecutor replied that, although Young was under pressure from his family not to testify, he confirmed the substance of his statements and told the police that "he would follow through and ... do the right thing." Defense counsel agreed that Young should be questioned outside the jury's presence. Defense counsel and the prosecutor agreed that the trial court could order Young to testify.
>
> Young was then questioned outside the presence of the jury. When the prosecutor proposed to play the tape recorded statements that Young had made to the police, Young stated that he did not have to answer the questions because he would not testify and he questioned why he should have to listen to the tape. The court explained, "It's for the sake of creating a record. The contempt will come into play, Mr. Young, if at all, if you refuse to testify to a specific question in front of the jury."

During the questioning, Young admitted his statements to the police were true, and he responded to most of the prosecutor's questions. At various times, however, Young indicated that he did not know whether he would answer the same questions before the jury. Finally, Young refused to answer any more questions from the prosecutor, but he agreed to answer defense counsel's questions. Brief cross-examination followed. The trial court ordered Young to testify before the jury. The court also ruled that the prosecutor was permitted to ask leading questions before the jury in those areas that Young was uncooperative.

The jury returned to the courtroom. Young answered the prosecutor's questions regarding his plea, sentence, and his familial relationships to defendant and Felder, but he refused to answer questions concerning the influence that defendant had over Felder. The prosecutor presented Young with part of his prior statement to refresh his recollection on the issue of control. Young refused to comment. The prosecutor asked Young for his reason for not responding, and Young replied that he just refused to answer. The prosecutor then asked Young several other questions that he answered. Young, however, refused to answer questions about Felder entering Bryant's house to obtain a weapon. At one point, Young said that he would not answer any more questions. The trial court ordered Young to testify and questioning continued. Young answered some questions, but refused to answer others concerning defendant.

Defense counsel requested a sidebar and said, "My concern is he is making a record refusing to answer certain critical questions[, w]hich, if he refuses to answer to me, will affect my ability to cross-examine him on the issues." The court replied:

> That's the way the process works. But he is answering some and he is not answering others. So it's impossible. If this was a continued course of no answer, then perhaps in a few more minutes I would agree with your point. But at this point he is answering some. He is not answering others.

> It's impossible at least for me to predict he was going to answer, he was not going to answer. And, indeed, you are going to have the right to cross-examine him on everything if you wish. Even those areas that he's refused to answer if you want.

Defense counsel responded:

> My problem is if he is not answering questions with respect to when the prosecutor is asking questions, there is going to be an instruction that questions are not evidence. The problem is that information is going to be before the jury. Like with respect to questions as far as did you leave the scene with [defendant].

The court replied that the jury would be instructed not to draw any inference whatsoever from anything relating to Young not answering a question.  Defense counsel noted that would help.

Young refused to answer whether he received a ride after the shooting; whether he saw something happen that caused him concern just before Felder left Bryant's house; who drove him to Philadelphia on the night of the shooting; who was with him in Philadelphia; whether he discussed an alibi with anyone that night; and whether he told the police that defendant was jealous of Patterson.  The prosecutor asked Young if he remembered defendant telling Felder he should have killed Patterson's father to eliminate any witness, and Young answered, "No, that is not what happened.  I am not answering that question."  At some point during Young's direct examination, the trial court instructed the jury to disregard the facts in any unanswered question unless the jury found the facts from other independent evidence.

During cross-examination, Young answered most of the questions, but refused to answer whether certain people were selling drugs for defendant in the summer of 1999.  At one point, the prosecutor objected to defense counsel's questions about topics that Young refused to respond to on direct examination.  The court overruled the objection.

On re-direct examination, the prosecutor asked Young if he had informed the police that defendant told Felder to kill Patterson.  Young initially said he did not say that and then added he did not recall saying that.  After Young was permitted to review a copy of his statement to the police, the following colloquy took place:

> PROSECUTOR: Isn't it a fact that your statement to the police on September 15, within nine days of the shooting, your statement to the police ... was, "I don't really feel as though [Felder] is all responsible even though he pulled the trigger.  I believe that ... 90 percent of that was the person that gave the call to do it, you know.  I mean, if you don't have no beef with nobody, you ain't going to bother them unless somebody tell you to do it.  And I believe that [defendant] told him to do it.  And that's my cousin.  They both my cousins, [defendant] my older cousin, [Felder] my younger cousin."  Isn't that in fact what you told the police?

> YOUNG: But I never heard [defendant] tell [Felder] shoot him.

> PROSECUTOR: You did say this to the police, though, didn't you, sir?

> YOUNG: May I say something, Your Honor?

> COURT: Yes.

YOUNG: I said a lot of things because I was mad at both of my cousins.  I know [Felder] shot him.  That is no secret.  I believe that [defendant] probably could have stopped him like I tried to stop him.  But I believe that [defendant] didn't stop him.  I mean, that's just where I am at with that.  I was mad.  I said a lot of things out of anger.

PROSECUTOR: So you acknowledge on February—on September 15, you said even though you loved your cousin, that you told the police that you believed that [defendant] told [Felder] to do the killing.  That's what you told the police, didn't you?

YOUNG: That's what [Felder] told me.

PROSECUTOR: No, no.

YOUNG: I am not answering that question.

PROSECUTOR: Sir, answer my question.

YOUNG: I am not answering that question.

PROSECUTOR: Excuse me?

YOUNG: I am not answering that question.

PROSECUTOR: You are now saying that your explanation for why you told the police that [defendant] told [Felder] to do it was because you were mad at [defendant], right?

YOUNG: I believe he could have stopped it.

....

PROSECUTOR: The reason that you told the police something that now you are telling us that was false was because ... you were mad at both cousins?

YOUNG: At that time—let me explain this to you. I didn't know that [Patterson] slapped [Felder] which you all told me that.

PROSECUTOR: No. You—

YOUNG: You want to hear me out?

PROSECUTOR: I'd like you to answer my question yes or no.

YOUNG: I am not answering the question.

8

On re-cross examination, defense counsel established that Young never heard defendant tell Felder to kill Patterson and that his statement to the contrary merely reflected his belief at the time. The prosecutor then asked Young if knowing that Patterson had slapped Felder a few days before the shooting changed the fact he, Young, told the police that defendant instructed Felder to kill Patterson. Young replied that he was certain that if Felder were slapped, Felder would retaliate. Young refused to answer whether he saw defendant unjam the gun.

At the conclusion of Young's testimony, the trial court reminded the jury that it should draw no inferences from facts contained in questions that Young refused to answer. During this instruction, the court added, "The mere fact that Mr. Young *didn't answer the questions is for your consideration as to the existence of those facts.*" (Emphasis added). Out of the presence of the jury, the trial court found Young guilty of contempt for refusing to answer questions.

During closing arguments, the prosecutor told the jury:

> Young cares no more about truth and justice and vindicating what happened out there that day than the man in the moon. He made that very clear to us when he took the oath and said the first things out of his mouth.... He said, "I don't want to testify against this man here for the reasons that," and again, you rely upon your recollection because I don't want to misstate it. You remember what ... Young said. Compare that to what ... Young said to the police on September 15th.

Later in his summation, the prosecutor added that "we didn't [get] much from [Young], but we certainly got enough to really see what the truth really was with ... Young and why ... Young won't testify."

In the final jury instructions, the court repeated the admonition that "[t]he mere fact that an attorney asks a question and inserts a fact or comments or opinions in that question in no way proves the existence of those facts."

*State v. Burns*, 192 N.J. at 323-28.

On March 28, 2002, a jury found Petitioner guilty of Counts One, Three and Four; respectively, first degree murder, second degree possession of a weapon for an unlawful purpose, and third degree hindering apprehension. However, the jury acquitted him of Count Two, third degree unlawful possession of a weapon. At sentencing on June 14, 2002, Petitioner was sentenced to life in prison with thirty years of parole ineligibility on the murder conviction and to a five-year consecutive sentence on the conviction for hindering apprehension.

Petitioner then appealed his convictions to the Superior Court of New Jersey, Appellate Division.  Although the Appellate Division determined that none of the points of error raised by Petitioner warranted reversal of his conviction, the panel ruled that reversal was required in light of an issue raised *sua sponte* regarding the testimony of Tifani Young. *See State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *2 (N.J. Super. Ct. App. Div. May 11, 2006) *rev'd*, 192 N.J. 312, 929 A.2d 1041 (2007).  Specifically, the appellate division determined Young should not have been permitted to testify after the prosecutor and the trial judge knew he would refuse to answer questions because Young's refusal to answer key questions improperly added critical weight to the prosecution's case and prejudiced Petitioner. *Id.*

The Supreme Court of New Jersey granted the State's petition for certification and, on July 26, 2007, reversed the decision of the appellate division and remanded the case to the superior court for reinstatement of Petitioner's judgment of conviction. *See State v. Burns*, 192 N.J. 312, 929 A.2d 1041 (2007).

Petitioner subsequently filed a petition for post-conviction relief ("PCR") in August, 2007.  The PCR court denied the PCR petition on April 27, 2010.  (ECF No. 9-44).  The Appellate Division affirmed that denial on June 4, 2012. *See State v. Burns*, No. A-1098-10T2, 2012 WL 1969934, at *1 (N.J. Super. Ct. App. Div. June 4, 2012); (ECF No. 9-56).  The New Jersey Supreme Court denied certification on November 30, 2012. *See State v. Burns*, 213 N.J. 396, 64 A.3d 237 (2012); (ECF No. 9-44).

Petitioner then initiated this federal proceeding by filing a petition for writ of habeas corpus on or about March 22, 2013. (ECF No. 1).  Petitioner was given the requisite notice pursuant to *Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000). (ECF No. 2).   He informed the Court

that he wanted his petition to be ruled upon as filed.  (ECF No. 3).  Respondents filed their response on October 9, 2013. (ECF No. 9).  Petitioner did not file a traverse.

### III.     HABEAS CORPUS LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States.  *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also*, *Mason v. Myers*, 208 F.3d at 415 n.1 (citing 28 U.S.C. § 2254).  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision."  *Id.* (citations omitted).  A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *See Williams v. Taylor*, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue a writ simply because the court concludes in its

independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011) (quotations omitted).  The petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision.  *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008).  Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594, 115 L. Ed. 2d 706 (1991).  Additionally, AEDPA deference is not excused when state courts issue summary rulings on claims as "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99, 131 S. Ct. 770, 784-85, 178 L. Ed. 2d 624 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265, 109 S. Ct. 1038, 1044, 103 L. Ed. 2d 308 (1989)).

## IV.   DISCUSSION

Petitioner sets forth multiple grounds for relief in his habeas petition; specifically:

1. The State Supreme Court erred in overturning the appellate division's decision to reverse Petitioner's conviction. (Pet. 11, ECF No. 1).

2. The trial court erred by failing to remove a juror for cause where the juror initially stated that she could not be fair and impartial. (*Id.* at 14).

3. The trail court erred by failing to remove a juror who failed to disclose his relationship with law enforcement officials. (*Id.* at 16).

4. The trial court erred by failing to remove or voir dire a sleeping juror. (*Id.* at 19).

5. The trial court erred by failing to instruct the jury that Petitioner could be convicted of the lesser included offenses as an accomplice. (*Id.*).

6. Petitioner's state constitutional rights were violated when he was convicted of a murder via a crime not charged by the grand jury. (*Id.*).

7. Petitioner was denied a fair trial because of the cumulative effect of: (a) Respondents improper presentation of the testimony of Tony Felder's defense counsel who testified that Felder entered into a guilty plea to give testimony regarding Petitioner's guilt; and (b) the prosecution's improper argument to the jury that a witness's refusal to answer a question represents the truth. (*Id.* at 20).

8. The trial court erred by advising the jury that the accomplice charge only applied to the murder offense and not to the lesser-included offenses of aggravated manslaughter and reckless manslaughter. (*Id.*).

9. The trial court erred by permitting Bobby Bryant to testify that he was in fear for the safety of his family. (*Id.*).

10. The trial court erred by permitting Curtis Calhoun to testify regarding Petitioner's alleged attempt to create an alibi. (*Id.* at 21).

11. The trial court erred by permitting defense counsel for Tony Felder to testify that Mr. Felder entered into a plea agreement and admitted that Petitioner had influenced Mr. Felder, who was underage at the time of the alleged crime. (*Id.*).

12. The prosecutor violated Petitioner's right to a fair trial when he advised the jury during summation that if they found Petitioner guilty of murder, he was also guilty of the weapons offenses. (*Id.*).

13. Petitioner's rights to due process and a fair trial were violated when hearsay testimony inculpating Petitioner was admitted by declarants unavailable for cross-examination. (*Id.* at 22).

14. The prosecutor committed prejudicial misconduct by asking Petitioner to characterize the prosecution's witnesses as liars. (*Id.*).

15. The trial court erred by sentencing Petitioner to consecutive maximum terms based upon facts neither admitted by Petitioner nor found by the jury. (*Id.* at 23).

16. Petitioner was improperly convicted of murder via the principal's intent. (*Id.*).

These grounds for relief will be considered in turn.

A. Ground 1:  State Supreme Court erred in overturning the appellate division's decision to reverse Petitioner's conviction

Petitioner argues that Supreme Court of New Jersey erred in overturning the decision of the appellate court.  In support of this argument, Petitioner relies on the analysis set forth in the appellate division's opinion reversing his conviction.[6]  In sum, the Appellate Division stated:

> [R]eversal is required because of the trial judge's handling of the testimony of Tifani Young.  Young was a critical witness for the State and was permitted to testify after the prosecutor and the trial judge knew he would refuse to answer questions when he believed his answers would support the State's case against

---

[6] The portion of Petitioner's brief devoted to this argument (ECF No. 1-2) is, for the most part, a collection of passages from the opinion of the state appellate court.

Burns, who was his cousin.  Each time he refused to answer such questions before the jury, Burns suffered prejudice.  We reverse on that ground.

*State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *2 (footnote omitted); (N.J. Appellate

Opinion 4-5, App. Ra9, May 11, 2006, ECF No. 9-13).

Based on the appellate court's reasoning, Petitioner concludes that, by permitting Young to testify, the trial court "caused [P]etitioner to be prejudiced and/or resulted in the Confrontation Clause of the Sixth Amendment to the U.S. Constitution being violated[.]" (Pet. 18, ECF No. 1-2).  Petitioner also challenges the instructions given to the jury regarding this issue. (Pet. 13, ECF No. 1-2).

Respondents contend that the New Jersey Supreme Court's ruling—which overturned the appellate division's decision and reinstated Petitioner's conviction—was proper and did not violate Petitioner's constitutional rights.  Specifically, Respondents argue that the New Jersey Supreme Court was correct in its determination that there was no prosecutorial misconduct; that the trial court did not err in allowing the State to call Young as a witness; and that the jury instructions were proper.

In addressing this issue, the New Jersey Supreme Court first determined that the circumstances of this case did not involve a witness's invocation of a constitutional privilege in the presence of the jury.  The New Jersey Supreme Court then stated:

> We conclude that, faced with the difficult dilemma of handling a recalcitrant witness who had no valid basis to refuse to testify, the trial court did not abuse its discretion by allowing the prosecutor to call a witness who declined to answer specific questions before the jury. We also conclude that the trial court properly instructed the jury not to consider the facts in the questions that the witness declined to answer, and that any error not objected to in the charge does not require reversal of defendant's conviction.

*State v. Burns*, 192 N.J. at 319; (N.J. Supreme Ct. Opinion 2, App. Ra21, July 26, 2007, ECF No. 9-26).

1.   <u>Analysis</u>

a.   <u>Confrontation Clause Claim</u>

The Confrontation Clause of the Sixth Amendment, made applicable to the states through the Fourteenth Amendment, provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.  In *Crawford v. Washington*, the Supreme Court held that the Sixth Amendment's Confrontation Clause bars the prosecution from introducing out-of-court testimonial statements unless the declarant is unavailable and the defendant had an opportunity to cross-examine the declarant. 541 U.S. 36, 53-54, 124 S. Ct. 1354, 1365, 158 L. Ed. 2d 177 (2004).

Further, the Supreme Court has held that a criminal defendant's due process rights under the Confrontation Clause may be violated—and reversible error may exist—when "'inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination.'" *Douglas v. Alabama,* 380 U.S. 415, 420, 85 S. Ct. 1074, 1077, 13 L. Ed. 2d 934 (1965) (quoting *Namet v. United States*, 373 U.S. 179, 187, 83 S. Ct. 1151, 1155, 10 L. Ed. 2d 278 (1963)).  The Third Circuit has cited that language in *Douglas* as controlling law. *See United States v. McGlory,* 968 F.2d 309, 344 (3d Cir. 1992) ("We have recognized that reversible error, on Sixth Amendment grounds, may occur where the witness' testimony adds critical weight to the prosecution's case in a form not subject to cross-examination."); *Todaro v. Fulcomer,* 944 F.3d 1079, 1084-85 (3d Cir. 1991).

This Court must determine whether the New Jersey Supreme Court unreasonably applied clearly established Supreme Court precedent when it held that Petitioner's rights under the Confrontation Clause were not violated by Young's testimony.  In doing so, this Court looks to relevant Supreme Court law.  First, in *Namet* the petitioner challenged his conviction on the

grounds that the prosecutor impermissibly questioned two witnesses regarding their relationship

with petitioner when the prosecutor knew that these witnesses would invoke their Fifth

Amendment privilege and refuse to answer. *See Namet*, 373 U.S. at 180.  In addressing this

issue, the Supreme Court first rejected the contention that "reversible error is invariably

committed whenever a witness claims his privilege not to answer." *Id.* at 186.  The Supreme

Court then noted that

> lower courts have looked to the surrounding circumstances in each case, focusing
> primarily on two factors, each of which suggests a distinct ground of error. First,
> some courts have indicated that error may be based upon a concept of
> prosecutorial misconduct, when the Government makes a conscious and flagrant
> attempt to build its case out of inferences arising from use of the testimonial
> privilege.
>
> . . .
>
> A second theory seems to rest upon the conclusion that, in the circumstances of a
> given case, inferences from a witness' refusal to answer added critical weight to
> the prosecution's case in a form not subject to cross-examination, and thus
> unfairly prejudiced the defendant.

*Namet*, 373 U.S. at 186.

With respect to the first factor, the Supreme Court concluded that the state prosecutor in

*Namet* had not committed prosecutorial misconduct because the prosecutor initially did not

believe that the witnesses had any valid privilege to invoke, because there remained an

"independent and quite proper reason to call" the witnesses, and because the witnesses did give

some testimony. *Id.* at 187.  As to the second, "critical weight" factor, the Court reasoned that the

witnesses' "few invocations of privilege . . . w[ere] minimized by the lengthy nonprivileged

testimony" connecting the petitioner with the crime and corroborating the government's case. *Id.*

at 189.  Moreover, the Court noted that the witnesses' "refusal to testify [was not] the only

source, or even the chief source, of the inference that the witness engaged in criminal activity

with the defendant." *Id.*  The Court further concluded that "the few claims of testimonial

privilege were at most cumulative support for an inference already well established by the nonprivileged portion of the witness' testimony." *Id.*

In *Douglas v. Alabama*, the Supreme Court relied upon the second theory articulated in *Namet*—the "critical weight" theory —and determined that the petitioner's right to confront witnesses at trial had been violated. 380 U.S. 415.  During the trial in that case, the State called a witness who had been indicted with petitioner, tried separately, and found guilty. *Id.* at 416. Because the witness intended to appeal his conviction, he asserted his Fifth Amendment privilege against self-incrimination, and refused to answer any questions concerning the alleged crime.  The trial court ruled that the witness could not rely on the privilege and, because the witness persisted in his refusal, the court ultimately allowed the State to cross-examine him as a hostile witness. *See id.*  The State then produced a document purported to be a confession signed by the witness and, under the "guise of cross-examination to refresh [the witness's] recollection," read the entire alleged confession into evidence in the presence of the jury. *Id.*

The petitioner in *Douglas* challenged this practice as violative of his right under the Confrontation Clause of the Sixth Amendment.  The Supreme Court held that the petitioner's "inability to cross-examine [the witness] as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause." *Id.* at 419.  The Supreme Court noted that while the prosecutor's reading of the confession was "not technically testimony," it "may well have been the equivalent in the jury's mind" and that the witness's "reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true." *Id.*  Further, the Court noted that the substance of that confession, and the inferences drawn therefrom, were effectively presented to the jury in a form not subject to confrontation.

Finally, because the confession was the only direct evidence connecting petitioner with the crime and establishing his mental state, the Supreme Court held that the prejudice in the denial of the right of cross-examination was not "a mere minor lapse." *Id.* at 420. Instead, the Court determined that "[t]he circumstances [were] such that 'inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.'" *Id.* (quoting *Namet*, 373 U.S. at 187).

Recently, the Third Circuit utilized the holdings in *Namet* and *Douglas* to determine that a petitioner was not entitled to habeas relief on a Confrontation Clause claim. *See Cagno v. Adm'r, New Jersey State Prison*, No. 14-4606, 2016 WL 732073, at *3 (3d Cir. Feb. 24, 2016). In *Cagno*, a certain witness, Lombardino, refused to testify in defendant Cagno's first trial, despite having no basis to do so. Because the jury was unable to reach a verdict, a superseding indictment was filed and a second trial ensued. In Cagno's second trial, the trial court permitted other witnesses to testify regarding Lombardino's prior refusal to testify. Cagno was convicted and, ultimately, the New Jersey Supreme Court affirmed the conviction. Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 and the district court granted habeas relief. In reversing the district court's decision, however, the Third Circuit distinguished the circumstances of *Cagno* from those in *Namet* and *Douglas* and concluded that the state court's rejection of Cagno's Confrontation Clause claim was not contrary to, or an unreasonable application of, clearly established federal law. *Cagno*, No. 14-4606, 2016 WL 732073, at *5.

The case presently before this Court is distinguishable from *Namet* and *Douglas*, and similar to *Cagno*, in that the witness here did not refuse to answer questions based on any asserted privilege. The record is clear that Young understood he had no valid basis to refuse to testify, and yet he still refused. Regardless, the Court's analyses in *Namet* and *Douglas* focus not

on the appropriateness of, or basis for, a witness's refusal to testify; but on the circumstances surrounding his refusal viewed in the larger context of the entire case—*i.e.* the propriety of placing a witness who may refuse to testify on the stand, and the impact of the refusal on the case. *See Namet*, 373 U.S. at 186.  With these underlying concepts in mind, this Court reviews the decision of the New Jersey Supreme Court to determine whether its ruling in this case was contrary to, or an unreasonable application of, Supreme Court precedent.

####    b.   Prosecutorial Misconduct

Prosecutorial misconduct may arise when the government calls witnesses in a "conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Namet*, 373 U.S. at 186.   In the instant case, Petitioner asserts that it was prejudicial prosecutorial misconduct for the prosecutor to call Young as a witness because "the prosecutor clearly knew [that] the witness Mr. Young was not going to answer any questions that incriminated petitioner[.]" (Pet. 15, ECF No. 1-2).  Indeed, the prosecutor informed the court that Young "is not happy about being here today," that Young had "communicated he'd rather not be here," and that he stated that he "was here under compulsion." (Trial Tr. 103:12-19, Colloquy, App. Rta9 – part 1, Mar. 7, 2002, ECF No. 9-73).

However, although the prosecutor conceded that Young "was under a lot of pressure from his family not to testify today," the prosecutor also informed the court that Young "has told our detective recently . . . that he would follow through and would do the right thing." (*Id.* at 110:15-21).  The prosecutor further stated that Young "once again was confirming the substance of his three taped statements that he has given to the detectives in the investigation." (*Id.* at 110:22-24).  Therefore, although the prosecutor was aware that Young was hesitant to testify, he also had reason to believe that Young would, in fact, testify. *See Namet*, 373 U.S. at 188 ("the prosecutor

need not accept at face value every asserted claim of privilege, no matter how frivolous"); *see also, e.g., United States v. Torrez-Ortega*, 184 F.3d 1128, 1137 (10th Cir. 1999) (finding no prosecutorial misconduct because "[t]here is no evidence before us that the government knew in advance of trial that [the witness] definitely would not testify."); *United States v. Inadi*, 748 F.2d 812, 820 (3d Cir. 1984) *rev'd on other grounds*, 475 U.S. 387, 106 S. Ct. 1121, 89 L. Ed. 2d 390 (1986) ("[P]redictions by government counsel [that a witness will refuse to testify] cannot be recognized as the equivalent of the actual scenario where a witness has appeared in court and refused to testify after a court order.  Every veteran trial judge has experienced the situation where a hostile witness discards his 'stonewalling' tactics when faced with an imminent contempt citation."); *Black v. Woods*, 651 F.2d 528, 531 (8th Cir. 1981) ("[A]lthough [the witness] had indicated she would refuse to testify, neither the government nor the court could be sure that she would do so until she was directed to testify by the court.").

Additionally, this Court notes—as did the New Jersey Supreme Court—that Young was an important witness for the State who was called, in part, to establish a record. *See Namet*, 373 U.S. at 188 (noting that "there remained an independent and quite proper reason to call [the] witnesses").  Further, Young did, in fact, testify and he provided substantial information relevant to the State's case. *See id.* (noting that the witnesses "possessed nonprivileged information that could be used to corroborate the Government's case," that the witnesses did testify as to this information, and that the "Government had a right to put this evidence before the jury.").  Among other things, Young testified that Petitioner sold drugs in an area of Mount Holly known as the Gardens (Trial Tr. 181:9-15, Testimony of Tifani Young, App. Rta9 – part 2, Mar. 7, 2002, ECF No. 9-74) (hereinafter "Young Testimony"); that Petitioner and the victim were "at war" over the drug market in the Gardens (*id.* at 182:15-183:5); that at the time of the murder

Young was unaware of any conflict, or "beef," that Felder had with the victim (*id.* at 182:6-16);

that Young had given three separate statements to the police throughout the murder investigation

(*id.* at 186:15-20); that Young was present at Bobby Bryant's house on the night of the murder

with Felder and Petitioner (*id.* at 195:3-5, 199:5-7); that Petitioner engaged in name-calling of

the victim the night of the murder (*id.* at 202:14-24, 203:23 – 205:9); that there existed tension

between Petitioner and the victim (*id.* at 202:25-203:4); and that on the night of the murder

Petitioner said to Young several times that "he hopes the [victim] is dead" (*id.* at 232:22-233:6).

With respect to the prosecutor's conduct, the New Jersey Supreme Court noted only one

instance which it construed as a possible attempt to bolster the State's case through the use of an

inference drawn from Young's refusal to testify.  Specifically, during his closing summation, the

prosecutor stated, "we certainly got enough to really see what the truth really was with Tiffany

[sic] Young and why [he] won't testify." (Trial Tr. 119:12-14, Milavsky Closing Summation,

App. Rta19 – part 1, Mar. 27, 2002, ECF No. 90).  This, the New Jersey Supreme Court stated,

"may have been a subtle effort to convince the jury to infer that Young refused to answer certain

questions because the answers would be detrimental to defendant." *Burns*, 192 N.J. at 335.

However, this was the only example of a potential improper use of Young's hesitance to testify

recognized by the New Jersey Supreme Court, and Petitioner does not identify any others in the

instant Petition.

Accordingly, the prosecutor in this case presented a witness who had no valid basis to

refuse to testify, who had indicated that he might testify, and who did, in fact, provide substantial

testimony relevant to the State's case.  Therefore, even assuming that the prosecutor made an

improper comment in summation for the purpose of eliciting an inference from Young's refusal

to answer certain questions, given the totality of the circumstances in this case, this Court cannot

determine that the New Jersey Supreme Court's ruling—that the prosecutor's actions did not rise to the level of prosecutorial misconduct—was contrary to, or an unreasonable application of, relevant Supreme Court precedent. [7] *See Namet*, 373 U.S. at 189 ("We cannot find that these few lapses, when viewed in the context of the entire trial, amounted to planned or deliberate attempts by the Government to make capital out of witnesses' refusals to testify.").

      c.  <u>Critical Weight</u>

As set forth above, the Supreme Court has stated that reversible error may exist where, "in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Namet*, 373 U.S. at 187; *see also Douglas*, 380 U.S. at 420.   In this case, Petitioner asserts that Young's refusal to answer questions improperly added critical weight to the prosecution's case.  Although Petitioner does not identify the specific refusals which he believes caused him prejudice, Petitioner generally relies on the rationale of the state appellate court's opinion reversing his conviction.  In that opinion, the state appellate court noted that Young refused to answer questions regarding:

> whether [Petitioner] had a lot of control over Felder; whether his prior statement implicating [Petitioner] refreshed his recollection; whether [Petitioner] was jealous of the victim; whether he told the police that he believed [Petitioner] told Felder to shoot the victim; whether he told the police that "[t]hey took a life ... and they did something that can't be justified ....;" whether he told the police that he had seen a gun; whether he told the police that he had seen [Petitioner] unjam the gun.

*State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *14.

---

[7] Even assuming that the prosecutor's comment in summation was inappropriate and did invite the jury to draw a negative inference from Young's refusal to testify, the impact of this comment did not significantly prejudice the Petitioner because, as discussed below, the trial court instructed the jury otherwise.

In addressing whether the inferences created by Young's refusal to answer questions on these topics warranted reversal of Petitioner's conviction, the New Jersey Supreme Court examined the strength of the State's case against petitioner, and reviewed each "instance[] of Young's refusal to testify to determine whether his refusals added critical weight to the State's case." *Id.* at 337.  After a thorough analysis of the issues raised in each line of questioning for which Young refused to provide answers, the New Jersey Supreme Court concluded that

> [b]ased on the overwhelming evidence of defendant's role in the shooting of Patterson, the proper admission of Young's prior inconsistent statements, and the lack of objections to the trial court's instructions to the jury, we conclude that Young's refusal to testify to certain questions did not add critical weight to the State's case in a form not subject to cross-examination that unfairly prejudiced defendant.

*State v. Burns*, 192 N.J. at 340.

In reviewing the New Jersey Supreme Court's analysis, this Court likewise observes that significant evidence was presented at trial regarding Petitioner's role in the shooting.  Indeed, with regard to several of the topics concerning which Young refused to answer questions, Young's prior inconsistent statements were admitted.[8]

For example, when questioned regarding the topic of Petitioner's control over the family, Young indicated that he could not recall what he had previously stated to police. *See* (Young Testimony 191:9-18, ECF No. 9-74) ("The court reporter has just read back the area relating to the defendant's alleged quote, 'Control over members of the family.' End quote. And it's clear that the witness, Mr. Young, testified that he did not have a present recollection.  He recalls

---

[8] This Court notes that, with the exception of certain statements admitted through the testimony of Detective D'Ascentis (*see* Ground 13), Petitioner did not at trial, and does not now, challenge the admission of prior inconsistent statements.  Moreover, a challenge regarding the admissibility of evidence is generally not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 67-68; *Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence.").

having the discussion with law enforcement but he doesn't recall what the nature of that

discussion was.  Accordingly, [defense counsel's] objection [to a question on that topic] is

overruled.  That question may be asked.").  When shown his previous statement to police and

questioned further, Young refused to comment. (*Id.* at 194:5-7).  Accordingly, the New Jersey

Supreme Court determined that "in light of Young's inconsistent testimony, the trial court

properly permitted the prosecutor to use Young's statements to the police on that issue."[9] *State v.*

*Burns*, 192 N.J. at 338.  Petitioner does not challenge this particular evidentiary ruling.

    Similarly, when questioned as to whether Petitioner was jealous of the victim, Young

first stated that he didn't know (Young Testimony 202:7-13, ECF No. 9-74), and then stated that

he didn't know and couldn't recall (*id.* at 231:3).  The New Jersey Supreme Court held that,

because that statement was inconsistent with Young's prior statement to police, the trial court

properly permitted the prosecutor to offer Young's statement that "[Petitioner] was jealous of

Bullet because Bullet was makin' money and just bought a Lexus." *Burns*, 192 N.J. at 338;

(Young Testimony 231:11-13, ECF No. 9-74).  Again, Petitioner does not challenge this

particular evidentiary ruling.

    When questioned as to whether he told the police that Petitioner told Felder to shoot the

victim, Young first indicated that he never told the police that, and then stated that he did not

recall saying that to police. (Young Testimony 280:14-20, ECF No. 9-74) ("Q: As a matter of

fact, you told the police on page 17 that your cousin Black was the one that told Tone to do the

killing, didn't you?  A: I never told the cops that Black told Tone to shoot nobody.  Q: You never

---

[9] In his closing arguments, the prosecutor invited the jury to compare Young's testimony during
trial to the statements he made to police during the investigation. (Trial Tr. 108:14-16, Milavsky
Closing Summation, App. Rta19 – part 1, Mar. 27, 2002, ECF No. 90) ("You remember what
Tiffany [sic] Young said.  Compare that to what Tiffany [sic] Young said to the police on
September 15th.").

told the police that?  A: Not that I can recall.").  The New Jersey Supreme Court found that the trial court properly permitted the prosecutor to read Young's previous police statement into the record to refresh Young's recollection on this subject. *Burns*, 192 N.J. at 338.  Although Young clarified that he never told the police that he *heard* Petitioner tell Felder to shoot the victim, Young refused to answer questions as to whether he told police that he *believed* Petitioner had told Felder to shoot the victim.  Instead, Young explained that he "said a lot of things out of anger" and "believe[d] [Petitioner] could have stopped it." (Young Testimony 285:8-9, 285:22-25, ECF No. 9-74).  Because these statements were inconsistent with Young's previous statements to police, the New Jersey Supreme Court permitted the prosecutor to read into evidence Young's previous statement in which he told the police that "[t]hey took a life ... and they did something that can't be justified[.]" (*Id.* at 286:15-21); *Burns*, 192 N.J. at 338.  Young then refused to answer questions as to why he made this statement to police.

Finally, this Court notes that the New Jersey Supreme Court pointed out one other line of questioning which Young refused to answer.  Specifically, when questioned about whether he remembered Petitioner criticizing Felder for not shooting the victim's father, who had witnessed the shooting, Young initially twice responded "No, that is not what happened," and otherwise refused to answer the question. (Young Testimony 233:17 – 234:23, ECF No. 9-74).   The prosecutor then invited Young to read a portion of the statement he gave to police because his trial testimony was inconsistent with his prior statement; however, Young continued to refuse to answer any questions regarding this topic.  At sidebar, the trial court determined that this portion of Young's statement to police would be admissible during the testimony of another witness for the State: the detective who had taken Young's statement. (Trial Tr. 235:19 – 237:9, Colloquy, ECF No. 9-74).  The New Jersey Supreme Court found that the trial court did not err in allowing

the prosecutor to read the relevant portions of Young's statements to police under the prior inconsistent statement exception to hearsay. *See Burns*, 192 N.J. at 340.

Because each of these statements was read into evidence and deemed properly admitted by the New Jersey Supreme Court, the jury could rely on this evidence, *i.e.* Young's prior statements, in reaching their decision. *See, e.g.*, *Black v. Woods*, 651 F.2d at 531 ("The jury did not need to speculate about Link's testimony because her earlier statements were introduced into evidence.").

Moreover, as was the situation in *Namet*, the inferences created by Young's refusal to answer questions on these topics were not "the only source, or even the chief source, of the inference[s]" that led to Petitioner's conviction. *Namet*, 373 U.S. at 189; *see Cagno*, No. 14-4606, 2016 WL 732073, at *5 ("[E]vidence of Lombardino's refusal to testify was not the *only* evidence presented to demonstrate the continuing vitality of the conspiracy."). For example, with respect to whether Petitioner possessed some amount of control over Felder, Felder himself testified and described his relationship with Petitioner and the loyalty he felt toward him. *See, e.g.*, (Trial Tr. 10:1, Testimony of Tony Felder, App. Rta15, Mar. 20, 2002, ECF No. 9-83) (hereinafter "Felder Testimony") ("I used to look at him as a pop."); (*Id.* at 10:9, ECF No. 9-83) ("I looked up to him."); (*Id.* at 70:8-11) ("Q: What did you mean by that, for my cousin, yeah, it's worth it?  A: It's my blood.  If he wanted me to kill him, I'd kill him."); (*Id.* at 77:15-19) ("Q: And, again, the reason you went along with this and your -- the reason you said I'm going ride with you is why, Mr. Felder?  A: He's my cousin.").  Bobby Bryant also testified as to the "strong family ties" between Felder and Petitioner. (Trial Tr. 6:8-14, Testimony of Bobby Bryant, App. Rta11 – part 1, Mar. 13, 2002, ECF No. 9-76) (hereinafter "Bryant Testimony").

With regard to whether Petitioner was jealous of the victim, Felder testified that "Bullet was getting all the money when he was out there," and that Petitioner "didn't like it." (Felder Testimony 35:8-9, 11, ECF No. 9-83). Another witness, Christine Gehin, testified about Petitioner's potential jealousy of the victim, and his general dissatisfaction about the fact that Bullet's drug dealing business was doing better than his own. (Trial Tr. 153:5-9, Testimony of Christine Gehin, App. Rta8 – part 2, Mar. 6, 2002, ECF No. 9-72) ("I would see where Black had been before in dealing. Where he had a lot of customers and a lot of people would frequently buy from him. As opposed to in '99, more people were going towards Bullet. And he wasn't happy about that."). Additionally, although his testimony was not specific to the concept of jealousy, Bobby Bryant indicated that Petitioner's relationship with the victim "wasn't great," that "they didn't speak," and that "they had incidents." (Bryant Testimony 231:17, 231:23-24, App. Rta10, Mar. 12, 2002, ECF No. 9-75). Felder and other witnesses also testified that Petitioner had "beef" with the victim. (Felder Testimony 37:21-22, 43:14-15, ECF No. 9-83); (Trial Tr. 84:11, Testimony of Tonya Imes, App. Rta9 – part 1, Mar. 7, 2002, ECF No. 9-73) ("There was a beef between Black [Petitioner] and Ron [the victim].").

The state appellate court also found, and Petitioner impliedly argues, that Young's refusal to answer questions about the gun was particularly prejudicial to Petitioner. Specifically, the state appellate court stated Petitioner was prejudiced by Young's refusal to answer these questions because Petitioner's "guilt is more evident if one believes that he initially gave the gun to Felder." *Burns*, 2006 WL 1275077 at *14. However, as the New Jersey Supreme Court correctly pointed out, Young was not specifically questioned as to whether Petitioner initially handed the gun to Felder. Rather, Young was questioned—and refused to answer—about whether Petitioner unjammed the gun, and whether he saw a gun. Further, other evidence was

28

presented suggesting that Petitioner did, in fact, unjam a gun and hand it back to Felder. Felder,

Hightower, and Bryant all testified that they saw Petitioner unjam the gun and hand it back to

Felder just prior to the shooting. (Felder Testimony 101:3-5, ECF No. 9-83) ("[Petitioner] took

the gun from me. I had the gun and was trying to unjam it. But, he had took the gun out of my

hand and unjammed it."); (Bryant Testimony 49:16 – 50:13, ECF No. 9-76); (Trial Tr. 34:1-

36:4, Testimony of Lawrence Hightower, App. Rta10, Mar. 12, 2002, ECF No. 9-75).[10]

  Finally, this Court notes that Young also refused to answer the prosecutor's questions

regarding one of the vehicles he rode in the evening of the shooting; namely, the third vehicle.

Young refused to provide specific information such as when or where he was picked up or

dropped off by this third car, nor did he answer questions regarding whose car it was and

whether Petitioner entered this vehicle. (Young Testimony 220:12 – 221:2, 276:14 – 279:2, ECF

No. 9-74). Young did, however, confirm that this car got a flat tire the night of the shooting, and

he identified the car in a picture entered into evidence as the one with a spare ("donut") tire on it.

(*Id*. at 277:6-11, 278:11-17). Also, other witnesses provided testimony regarding this vehicle,

including where it was headed, who owned it, who was in the car, and who was driving. *See,

e.g.,* (Trial Tr. 81:25 – 82:20, Testimony of Lawrence Hightower, ECF No. 9-75); (Felder

Testimony 130:24 – 131:13, 135:13-14, ECF No. 9-83). Because Young provided some

testimony as to this topic, and because other witnesses provided testimony, and evidence was

---

[10] Moreover, this Court notes that both Felder and Bryant testified during trial that Petitioner was
the one to initially acquire the gun and give it to Felder. (Felder Testimony 86:14 - 87:7, ECF
No. 9-83) (Bryant Testimony 33:12 – 34:13, 39:11-20, ECF No. 9-76). Therefore, even if
Young had refused to answer a specific question regarding whether Petitioner was the one to
initially hand the gun to Felder, any potential inference created by that refusal would not have
been the only source, or even the chief source, of evidence suggesting that Petitioner did, in fact,
commit that act. Accordingly, any inference created by a refusal to answer questions on this
topic would not have added critical weight to the State's case. *See Namet*, 373 U.S. at 189.

introduced regarding this topic, this Court cannot conclude that Young's failure to answer certain questions regarding the car added critical weight to the State's case.

The factor of principal significance in this case is that Young's refusal to testify was not "the only source, or even the chief source," of the inference that Petitioner was engaged in criminal activity. *See Namet*, 373 U.S. at 189; *Cagno*, 2016 WL 732073 at *5. As discussed above, and noted by the New Jersey Supreme Court, Young's testimony was only part of the substantial evidence against Petitioner presented to the jury at trial.

> Felder, Hightower, and Bryant testified that they saw defendant unjam the gun and hand it to Felder prior to Felder leaving to shoot the victim. Additionally, the January 28, 2000 recorded telephone conversation between Felder and defendant was admitted into evidence. During that conversation, defendant complained to Felder that Young had gone to the police and told them that defendant had helped Felder unjam the gun. The record contains the testimony of numerous witnesses who testified that defendant disliked the victim, his attempts to have the victim killed, his unjamming of the gun after Felder's unsuccessful attempt to shoot Patterson, and his assistance to Felder in fleeing the scene of the crime.

*State v. Burns*, 192 N.J. at 340; *see also, e.g.,* (Felder Testimony 38:23-14, ECF No. 9-83) ("Q: Tell the jurors, what did [Petitioner] want you to do [with Bullet]? A: Kill him."); (Trial Tr. 27:13-23, Testimony of Lawrence Hightower, ECF No. 9-75) ("[Petitioner] was like – basically, he said he want[s] [Bullet] dead.").

Also significant in this case is the fact that defense counsel was afforded an opportunity to cross-examine Young. Petitioner does not identify any specific instances where Young refused to answer questions upon cross-examination, and this Court's review of the record shows that—with the exception of a question regarding other individuals who sold drugs during the time period in question—Young answered each of defense counsel's questions. *See* (Young Testimony 259:19 – 260:6, ECF No. 9-74). Moreover, the trial court specifically permitted defense counsel to question Young, even on topics for which he refused to answer questions posed by the State. (Trial Tr. 210:5-8, Colloquy, ECF No. 9-74) ("And, indeed, you are going to

30

have the right to cross-examine him on everything if you wish.  Even those areas that he's refused to answer if you want."); *see also* (Trial Tr. 255:4-6, Colloquy, ECF No. 9-74) ("I think the witness can change his mind and answer the [cross-examination] question.  And then [the State] can have redirect in the same area.").

During the extensive cross-examination and re-cross, Young clarified some of his earlier statements and offered an explanation for certain inconsistencies.  For example, during re-cross, Young clarified that he never actually heard Petitioner tell Felder to kill Bullet; rather, he simply believed Petitioner had told him to do so. (Young Testimony 287:13-17, ECF No. 9-74).  Additionally, Young offered a potential explanation for providing an inaccurate statement to police: because he was angry with Petitioner and Felder for putting the family in danger (*id.* at 289:2 – 290:2), and because at the time he gave the statement to police he was unaware of the "beef" that existed between Felder and the victim (*id.* at 287:25 – 288:23).  The fact that Petitioner was able to cross-examine Young lends further support to this Court's conclusion that the New Jersey Supreme Court's holding that Petitioner's Sixth Amendment rights were not violated was not contrary to, or an unreasonable application of, existing Supreme Court precedent.

In sum, this Court finds Petitioner's case analogous to the circumstances of the *Namet* case.  The impact of Young's refusal to answer certain questions was minimized by the considerable testimony he did provide which established a record, connected Petitioner with the crime, and corroborated the State's case. *See Namet*, 373 U.S. at 189.  In addition, as discussed above, substantial evidence was presented to the jury through testimony of other witnesses, and through the introduction of the recorded phone call.  Therefore, Young's "refusal to testify [was not] the only source, or even the chief source, of the inference" that the Petitioner engaged in

criminal activity. *Id.*   Rather, Young's refusals to answer certain questions "were at most cumulative support for an inference already well established by" other evidence and testimony provided during the trial. *Id.*

Moreover, unlike the petitioner in *Douglas*, Young's prior statements to police were not read into the record under the "guise of cross-examination to refresh [the witness's] recollection." *Douglas*, 380 U.S. at 416.  In this case, the trial court addressed this issue in the context of a discussion on hearsay and Young's willingness to answer questions.  Notably, the trial court stated:

> The State is not going to be permitted to introduce the statements, the prior statements.  They're not going to be allowed to use those prior statements as substantive evidence because they're proceeding under a different theory of admissibility.  They're proceeding under a theory of using leading questions to an adverse witness rather than the use of a prior statement.

(Trial Tr. 164:12-19, Colloquy, ECF No. 9-74).

Defense counsel then expressed his concern that the prosecution did not intend to simply ask leading questions to elicit courtroom testimony, but instead intended to question Young regarding the prior statements he made to police.  After a brief discussion as to how the prosecution intended to proceed, the trial court ruled that, with respect to questions which Young demonstrated an inability to answer because of his uncooperativeness or his actual refusal to answer, "I am going to permit you to do it in a leading fashion *without* buttressing those statements, the statements here in Court today with reference to the prior statements [to police]." (*Id.* at 171:24 – 172:3) (emphasis added).  The trial court then clarified that,

> if [the witness] demonstrates an uncooperative or refusal here at this point, I think you then can go into the leading question area.  As long as you are *not* going to say ['O]n September 6th, 1999, you gave this statement and what you are saying here today is consistent with what you said.['] . . . I am not going to permit you to use the [prior] statements.

(*Id.* at 172:9-14, 173:12-13) (emphasis added).

In other words, the trial court in this case—unlike the trial court in *Douglas*—held that the State could not introduce Young's prior statements to police indirectly by reading a statement, and then asking Young if the statement was true. *See, e.g.,* (*Id.* at 168:5-12) ("But [to the extent you think] you can introduce the statement indirectly by saying ['you gave a statement on September 6, 1999 in which you said A, B, C and D; isn't that true?['] Cannot do that.  You can, however, use leading questions to elicit the same information.  Without reference to the fact that he gave a prior consistent statement to that effect.") (*Id.* at 168:5-12).  This difference further supports the New Jersey Supreme Court's ruling that Petitioner was not prejudiced. *Compare Douglas*, 380 U.S. at 416; *with Coleman v. State,* No. 05-10-01116-CR, 2012 WL 2402617, at *7 (Tex. App. June 27, 2012) (distinguishing from *Douglas* because the state's questions did not provide the details of a prior statement made by the witness).

Finally, in this case, Petitioner was able to cross-examine the witness.  Ordinarily, the Confrontation Clause is implicated when "restrictions [are] imposed by law or by the trial court on the scope of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 18, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam).  Here, however, the scope of cross-examination was not limited by the law or by the trial court, but by Young's decision to refuse to answer certain questions. *See, e.g., Venegas v. Biter*, No. 12-1239, 2013 WL 5966350, at *20 (C.D. Cal. Nov. 5, 2013) (finding that the scope of cross-examination was limited simply by the witness's refusal to testify).

Given the circumstances of this case—where Young's prior inconsistent statements were properly admitted, where substantial other evidence demonstrated Petitioner's role in the crime, and where defense counsel was permitted to cross-examine the witness—the New Jersey Supreme Court's ruling that "Young's refusal to testify to certain questions did not add critical

weight to the State's case in a form not subject to cross-examination that unfairly prejudiced [Petitioner]" is not contrary to, or an unreasonable application of, existing Supreme Court precedent. *Burns*, 192 N.J. at 340;[11] *see also, e.g., Cagno*, 2016 WL 732073; *Fernandez v. Adams*, No. 1:07-CV-01278, 2010 WL 5330483, at *29 (E.D. Cal. Dec. 20, 2010) ("No clearly established Supreme Court law provides that admission of a witness' testimony, who is likely to refuse to testify, violates due process.").

> d. <u>Jury Instructions</u>

Petitioner's final argument with respect to his rights under the Confrontation Clause is that he was prejudiced by the jury instructions.  Petitioner again references the appellate court's opinion in support of this claim.  At the conclusion of Young's testimony, the trial court instructed the jury:

> Finally, today we had a witness testify.  Mr. Young testified as to some items and refused to answer questions on other items.  I do not want you to draw any inference about facts that were contained in the questions that Mr. Burns refused to answer.  And many of the questions and -- Mr. Young.  I am sorry.  That Mr. Young refused to answer. Many of the questions contained facts. You may find from independent sources, from independent witnesses, from exhibits in the case or from other evidence in the case that the facts that were contained in the questions either did exist or don't exist.  Depending upon your assessment of those facts. Depending upon your evaluation of those exhibits.
>
> If you believe, as in other instances, that the State has proven beyond a reasonable doubt the existence of those facts, then you should find the existence of those facts.  Conversely, if you believe that the State hasn't proven the existence of those facts beyond a reasonable doubt, then you should not find the existence of those facts.  *The mere fact that Mr. Young didn't answer the questions is for your consideration as to the existence of those facts.*  Do you understand that?

---

[11] This Court notes that Respondents assert that Petitioner is not entitled to relief on this claim because "the record is clear that Petitioner was to blame for Young's refusal to answer the prosecutor's questions." (Resp't 72, ECF No. 9); *see also* (*Id.* at 74, 75).  While the Court makes no determination as to the precise reason for Young's refusal to answer certain questions, it does not accept Respondents' assertion that said refusal is "clearly" attributable to Petitioner; and this factor did not contribute to this Court's resolution of this claim.

> Finally, I have sustained objections to questions asked – to some questions asked by counsel which may have contained statements of certain facts. And you heard that. It occurred this afternoon much more than it had prior to this afternoon. The mere fact that someone asks a question and inserts facts or comments or opinions in that question in no way proves the existence of those facts. You will only consider such facts which, in your judgment, have been proven to you beyond a reasonable doubt by the State by the testimony of the witnesses or from exhibits admitted into evidence by the Court.

(Trial Tr. 294:9 – 295:19, Colloquy, Rta9 – part 2, Mar. 7, 2002, ECF No. 9-74) (emphasis added).

In analyzing these jury instructions, the state appellate court noted that the trial court properly "informed the jury that it should not draw inferences from the facts contained in the unanswered questions[.]" *State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *15. However, the appellate court also found that the charge "improperly informed the jury that '[t]he mere fact that Mr. Young didn't answer the questions [was] for [the jury's] consideration as to the existence of those facts,' thereby permitting the jury to infer that the refusal to answer could be taken as evidence that the answer would have supported the State's case." *Id.* Additionally, because the judge did not further address this issue in his final instructions, the appellate court determined that "the jury was left with the improper instruction noted above." *Id.* Thus, the appellate court found that this error supported reversal of Petitioner's conviction.

The Supreme Court of New Jersey, however, reached the opposite conclusion. Specifically, the New Jersey Supreme Court stated:

> Viewing the charges as a whole, it is apparent that the trial court intended to say that "[t]he mere fact that Mr. Young didn't answer the questions is [*not*] for your consideration as to the existence of those facts." (Emphasis added). We have no way of determining whether the trial court simply misspoke, or whether there is an error in the transcript. Notably, both prior to and after that comment, the trial court clearly informed the jury that, unless the jury found the facts from the evidence, it should not draw any inference about facts contained in the questions that the witness refused to answer.

*State v. Burns*, 192 N.J. at 343.  Therefore, the New Jersey Supreme Court concluded that "viewing the instructions as a whole, and in light of the overwhelming evidence of defendant's guilt, the brief inadvertent error in the instructions does not require a new trial." *Id.*

As an initial matter, it is unclear whether Supreme Court precedent requires—or even permits—a curative jury instruction where a witness, who has no constitutional or statutory basis for doing so, refuses to answer questions. *Cf. U. S. ex rel. Fournier v. Pinto*, 408 F.2d 539, 541 (3d Cir. 1969) ("In some cases, judges have cautioned the jury that no inference and no evidentiary significance may be drawn from or attached to the refusal of a witness to answer questions [because of a claimed privilege].  Other judges, in the absence of a defense request for such a charge, have thought it better to avoid reminding the jurors of the conduct of the witness even by a cautionary instruction.") (citations omitted).  The instant Petition does not cite to any Supreme Court case which squarely addresses this issue.

However, in *Namet*, the Supreme Court provided some guidance as to what is *not* an inappropriate instruction when presented with circumstances similar to those in this case.  Specifically, in *Namet* the trial court's instruction to the jury contained the following statement with regard to the testimony of the witness who refused to answer questions: "Nor shall any inference be drawn against [the defendant] because the [witnesses] refused to testify, unless it would be a logical inference that would appeal to you as having direct bearing upon the defendant's guilt." *Namet*, 373 U.S. at 185.  The *Namet* Court noted that the question of the correctness of the court's instruction to the jury was not before it.  Nevertheless, the Court stated that, even if the issue were before it,

> we could not find that the instruction amounted to reversible error on the facts of this case.  No objection was ever made to this instruction, even though counsel for the petitioner did object to other aspects of the charge.  Thus, we are not concerned with whether the instruction was right, but only whether, assuming it

> was wrong, it was a plain error or defect 'affecting substantial rights' under Rule 52(b) of the Federal Rules of Criminal Procedure.  What has been said concerning the very limited effect of any inferences arising from the [the witnesses'] refusals to testify makes it clear that this brief passage in the charge could not have affected any substantial rights of the petitioner.

*Id.* at 190-91 (footnotes omitted).

Given that the Supreme Court held that the instruction in *Namet*—which explicitly invited an inference based on a witness's refusal to testify—did not warrant reversal, this Court cannot say that the instruction at issue in this case—which may have invited a similar inference—had any substantial effect on Petitioner's rights.  Further, this Court notes—without expressing any opinion—that at least one other district court has held that jurors are permitted to draw a negative inference when a witness, who has no constitutional or statutory right not to testify, refuses to provide relevant testimony. *See, e.g., Brown v. Small*, No. 08-05529, 2011 WL 482766, at *6 (N.D. Cal. Feb. 7, 2011) ("Jurors are entitled to draw a negative inference when such a witness refuses to provide relevant testimony."); *see also Cagno*, 2016 WL 732073 (finding no violation of Supreme Court precedent where the New Jersey Supreme Court "concluded that how to interpret the evidence of Lombardino's refusal to testify . . . was properly left to the jury").

Moreover, even assuming that the challenged jury instruction was improper, Petitioner's federal rights were not violated when the New Jersey Supreme Court found no constitutional violation as a result of the improper instruction.  A faulty jury instruction constitutes a due process violation only if it so infected the entire trial that the resulting conviction violates due process. *See Middleton v. McNeil*, 541 U.S. 433, 437, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004); *Estelle*, 502 U.S. at 72.  Therefore, where a federal habeas petitioner seeks relief based upon the jury instructions in a state criminal proceeding, the question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502

U.S. at 72; *see also Bankowski v. Davis*, No. 11-3516, 2014 WL 2811810, at *10 (D.N.J. June 23, 2014).

Even assuming a constitutional error in the jury instructions, such an error is generally subject to a "harmless error" analysis. *Smith v. Horn*, 120 F.3d 400, 417 (3d Cir. 1997) (citing *California v. Roy*, 519 U.S. 2, 5, 117 S. Ct. 337, 338, 136 L. Ed. 2d 266 (1996) (citations and quotations omitted)) ("In a collateral proceeding, the standard for harmlessness is 'whether the error had substantial and injurious effect or influence in determining the jury's verdict.'"). "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." *Id.* at 418. In evaluating a challenged instruction, "[a] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Middleton,* 541 U.S. at 437 (citation omitted).

This Court has carefully reviewed the jury instructions as a whole and finds no error of constitutional dimension in this case. As noted above, the only challenged statement with respect to this claim is the trial judge's comment that, "[t]he mere fact that Mr. Young didn't answer the questions is for your consideration as to the existence of those facts." (Trial Tr. 295:4-6, Mar. 7, 2002, ECF No. 9-74). Even assuming that this singular instruction was improper, the jury was informed—both before and after this comment was made—that "[t]he mere fact that someone asks a question and inserts facts or comments or opinions in that question in no way proves the existence of those facts." (*Id.* at 295:12-19); *see also* (*id.* at 294:15-22). Therefore, the trial court plainly instructed the jury to only consider such facts which, in their judgment, had been proven by the testimony of the witnesses and from exhibits admitted into evidence. Moreover, the trial court also clearly instructed the jury *not* to draw any inference

from Young's refusal to answer certain questions. (*Id.* at 294:11-13).  The jury is presumed to have followed the instructions given to it by the trial judge.  *See Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 732, 145 L. Ed. 2d 727 (2000).  Given the instructions as a whole, this Court cannot conclude that the challenged statement—even if constitutionally improper—so infected the entire trial or had a substantial and injurious effect on the jury's verdict.  Accordingly, the New Jersey Supreme Court's determination that "the brief inadvertent error in the instructions does not require a new trial" was not contrary to, or an unreasonable application of Supreme Court precedent. *Burns*, 192 N.J. at 343.

### e.   Young's Affirmative Statement

Previously, this Court addressed the prejudice to Petitioner as the result of the prosecutor's decision to question Young, and the prejudice to Petitioner as the result of Young's refusal to answer certain questions.  The Court notes, however, that Young also stated, in the presence of the jury, "I can't testify against my family." (Young Testimony 105:15-16, ECF No. 73).  To the extent Petitioner asserts this affirmative statement, in itself, caused him sufficient prejudice to deprive him of his right to a fair trial, this Court finds that he is not entitled to habeas relief on this claim.  As an initial matter, Petitioner has not cited to any Supreme Court case which addresses this issue.  Therefore, the state court's rejection of this claim—to the extent it was considered—cannot be contrary to, or an unreasonable application of Supreme Court precedent.  Moreover, this Court again notes the instructions provided to the jury regarding what they should, and should not, consider in reaching a decision; as well as the substantial amount of evidence presented at trial establishing Petitioner's guilt.  Given the totality of the circumstances, Petitioner cannot show that this comment was so prejudicial, if at all, to rise to the level of a constitutional violation.

2.   Conclusion

For the foregoing reasons, the New Jersey Supreme Court's decision—that there was no prosecutorial misconduct, and that Young's refusal to testify did not add critical weight to the State's case in a form not subject to cross-examination—was not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on this ground.

B.   GROUNDS TWO, THREE AND FOUR: Trial court's failure to remove jurors for cause

1.   Standard of Review

Under the Sixth and Fourteenth Amendments, a defendant may not be deprived of any liberty without due process of law and in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) ("[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.").  The bias of a juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as a matter of law. *United States v. Wood*, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936); *see also United States v. Mitchell*, 690 F.3d 137, 144 (3d Cir. 2012).

Bias can be revealed by a juror's express admission of that fact, but more frequently, the reality of bias must be revealed by circumstantial evidence. *See Morgan v. Illinois*, 504 U.S. 719, 729–730, 112 S. Ct. 2222, 119 L.Ed.2d 492 (1992) (discussing juror bias in the context of voir dire).  The United States Constitution does not require a new trial every time a juror has been placed in a potentially compromising situation because it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

40

The question of actual bias is one of fact and best determined by the trial court's own assessment of a juror's impartiality, credibility and demeanor. *See Patton v. Yount*, 467 U.S. 1025, 1038, 104 S. Ct. 2885, 2892, 81 L. Ed. 2d 847 (1984); *Rosales–Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).  Under AEDPA, such factual determinations are "presumed to be correct," 28 U.S.C. § 2254(e)(1), and Petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Patton*, 467 U.S. at 1038; *see also Wainwright v. Witt*, 469 U.S. 412, 426, 105 S. Ct. 844, 853, 83 L. Ed. 2d 841 (1985).

2.   GROUND TWO:  Trial court's failure to remove a Juror No. 10 for cause

In his second ground for relief, Petitioner asserts that he was denied due process because the trial court "fail[ed] to remove for cause a juror who initially stated that she could not be fair and impartial[.]" (Pet. 19, ECF No. 1-2).

With respect to this claim, the record shows that, after opening statements, Juror No. 10 advised that she would like to speak to the court.  The judge then called Juror No. 10 into the courtroom and a colloquy ensued in which the judge discussed with Juror No. 10 the nature of her concern and her ability to sit on the case and decide it fairly and impartially. (Trial Tr. 116:16-130:8, Colloquy, App. Rta8 – part 1, Mar. 6, 2002, ECF No. 9-71).  The judge twice instructed Juror No. 10 not to discuss her concern with any other members of the jury.  (*Id.* at 124:6-8, 129:20-22).  The following day, the judge again spoke with Juror No. 10. (Trial Tr. 3:5-25, Colloquy, App. Rta9 – part 1, Mar. 7, 2002, ECF No. 9-73)  The record reveals that, during this conversation, Juror No. 10 indicated that she felt "at ease," "comfortable with the situation," and was able to proceed fairly and impartially. (*Id.*).

Although Petitioner did not move to strike this juror, or object to her continued service during trial, Petitioner raised this issue on direct appeal.  However, the appellate court determined that "none of the defense arguments require[d] reversal" and no further discussion on this issue was provided. *State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *2; *see also* N.J. Ct. R. 2:11-3 (permitting affirmance of judgment or order under appeal without opinion). Although the state court did not expressly address this issue, it is presumed to have been adjudicated on the merits. *See Johnson v. Williams*, 133 S. Ct. 1088, 1094, 185 L. Ed. 2d 105 *reh'g denied*, 133 S. Ct. 1858, 185 L. Ed. 2d 858 (2013) (citing *Richter*, 562 U.S. at 99) (holding that when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits, within the meaning of AEDPA).

Accordingly, because this claim has been adjudicated on the merits in the state court, and because the factual presumption of the state court is presumed to be correct, the question for this Court is whether Petitioner has presented the clear and convincing evidence required to rebut § 2254(e)(1)'s presumption.  This Court determines that he has not.

Based on the colloquy between the trial judge and Juror No. 10, there is sufficient support in the record for the state court's conclusion that Juror No. 10 would be impartial.  Petitioner simply did not present in his Petition the kind of clear and convincing evidence of bias that is needed to rebut § 2254(e)(1)'s presumption.  Contrary to Petitioner's assertion that Juror No. 10's "initial responses reflected upon her inability to sit fairly," (Pet. 21, ECF No. 1-2), the record indicates that the court explicitly called Juror No. 10 back into the courtroom to clarify that precise issue, and Juror No. 10 confirmed that she could, in fact, be fair and impartial. (Trial Tr. 127:17-19, ECF No. 9-71) ("I think I need to speak to her again really on that point.  The

record at least to me is not clear."); (*id.* at 12:15-16) (The Court: "Could you be fair and impartial at this point?" Juror No. 10: "Yes, I could."). Accordingly, Petitioner is not entitled to habeas relief on this claim.

3. GROUND THREE: Trial court's failure to remove Juror No. 13 for cause

Petitioner's third ground for relief appears to be two-fold. First, he asserts that he was denied due process because the trial court failed "to remove for cause a juror who failed to disclose his relationship with law enforcement officials[.]" (Pet. 24, ECF No. 1-2). Petitioner also contends that he was denied his right to exercise a peremptory challenge because a juror gave an inaccurate answer to a question in voir dire. (Pet. 25-26, ECF No. 1-2) .

With respect to this claim, the record shows that the prosecutor, Mr. Milavsky, received a call from another prosecutor in his office, Assistant Prosecutor Frank Hughes, who informed him that he had been approached after church by one of the jurors in Petitioner's case, Juror No. 13. (Trial Tr. 22:7-25:18, Colloquy, App. Rta13, Mar. 18, 2002, ECF No. 9-80). The following day, the court called Prosecutor Hughes to explore the issue. (Trial Tr. 4:6-7:10, Colloquy, App. Rta14 – part 1, Mar. 19, 2002, ECF No. 9-81). Prosecutor Hughes indicated that Juror No. 13 approached him after church and reported he was getting some experience in the justice system as a juror. (*Id.* at 4:25-5:1). Prosecutor Hughes testified that he recognized the potential implication, immediately changed the subject, and had no further discussion with Juror No. 13. (*Id.* at 5:1-6). Prosecutor Hughes further stated that he did not know on which case Juror No. 13 was serving as a juror, but he brought the incident to Mr. Milavsky's attention, who then notified the court. (*Id.* at 5:7-13). As to the relationship between Prosecutor Hughes and Juror No. 13, the record reveals that they attended the same church and both belonged to the Saints Council Knights of Columbus. (*Id.* at 4:19-21). Prosecutor Hughes testified that neither he nor his wife

socialized with Juror No. 13 beyond greeting each other at church or meetings, and that he saw Juror No. 13 approximately once per month. (*Id.* at 6:2-5, 6:11-14).

The Court then called Juror No. 13 to the stand to discuss the encounter with Prosecutor Hughes. (*Id.* at 10:10 – 14:8). Juror No. 13 confirmed that the extent of the conversation with Prosecutor Hughes was limited to Juror No. 13's report that he was a juror and was getting a "good feel for the criminal justice system." (*Id.* at 11:8-10). Juror No. 13 further confirmed that his relationship with Prosecutor Hughes was limited to their mutual membership to the same church and to the Knights of Columbus. (*Id.* at 14:2-3). Finally, Juror No. 13 reported that his relationship with Prosecutor Hughes, however limited, would not affect his ability to be a fair and impartial member of the jury. (*Id.* 14:4-7).

a. <u>Removal for Cause</u>

As with his previous argument, Petitioner raised this issue on direct appeal and the appellate court rejected the argument without providing a discussion. *See State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *2; *see also* N.J. Ct. R. 2:11-3. Nevertheless, for the reasons explained above, this issue is presumed to have been adjudicated on the merits. *See Johnson*, 133 S. Ct. at 1094. Accordingly, because this claim has been adjudicated on the merits in the state court, and because the factual presumption of the state court is presumed to be correct, the question for this Court is whether Petitioner has presented the clear and convincing evidence required to rebut § 2254(e)(1)'s presumption. This Court determines that he has not.

Based on the colloquy between the trial judge, Prosecutor Hughes, and Juror No. 13, there is sufficient support in the record for the state court's conclusion that Juror No. 13 would be impartial. Petitioner did not present in his Petition the kind of clear and convincing evidence of bias that is needed to rebut § 2254(e)(1)'s presumption. *See Yount*, 467 U.S. at 1038; *see also,*

*e.g., United States v. Abuhouran*, 162 F.3d 230, 234 (3d Cir. 1998) (affirming district court's conclusion that a juror's impartiality was not affected by her "incidental acquaintanceships" with the fiancée of the president of the victimized bank, the wife of a government witness, and the son of the United States Attorney).   Accordingly, Petitioner is not entitled to habeas relief on this claim.

b.   <u>Denied Right to Exercise Peremptory Challenge</u>

Petitioner asserts that Juror No. 13's knowledge of whether Mr. Hughes "was connected with the same prosecutor's office prosecuting petitioner is irrelevant[,]" and the ultimate concern is "petitioner's inability to utilize a peremptory challenge." (Pet. 24, 25, ECF No. 1).   Petitioner did not make this argument during trial and, although he raised this issue on direct appeal, the appellate court rejected the argument without providing a discussion. *See State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *2; *see also* N.J. Ct. R. 2:11-3.   As explained above, this issue is presumed to have been adjudicated on the merits. *See Johnson*, 133 S. Ct. at 1094.

As an initial matter, Petitioner does not cite to any federal law in support of this argument; only state law.   Thus, even assuming that Petitioner's right to exercise his peremptory challenges was somehow impaired in this case, Petitioner has not identified, and this Court cannot find, any existing Supreme Court precedent which suggests that he is entitled to federal habeas relief.   To the contrary, the Supreme Court has explicitly held that "peremptory challenges are a creature of statute and are not required by the Constitution[.]" *Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S. Ct. 2273, 2279, 101 L. Ed. 2d 80 (1988).   The Supreme Court has further clarified that nothing in its "decisions suggests that federal law renders state-court judgments void whenever there is a state-law defect in a tribunal's composition." *Rivera v. Illinois*, 556 U.S. 148, 150, 129 S. Ct. 1446, 1449, 173 L. Ed. 2d 320 (2009).   Rather, there must

be some federal constitutional violation that is "structural" in nature. *Id.* (quoting *Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)) ("Typically, an error is designated as 'structural,' therefore 'requir[ing] automatic reversal,' only when 'the error necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'").  No such constitutional violation exists in this case and Petitioner does not argue as much.  Accordingly, even assuming an improper denial of a state-provided peremptory challenge, Petitioner is not entitled to habeas relief as a matter of federal law. *See id.* ("Rivera errs in insisting that, even without a constitutional violation, the deprivation of a state-provided peremptory challenge requires reversal as a matter of federal law.").

Moreover, this Court notes that the cases cited by Petitioner are factually distinguishable from the instant case.  In the cases cited by Petitioner, the New Jersey state courts determined that a juror had not made a "full and truthful answer" and that "[t]he nondisclosure of a disqualification or legal disability" was of such a nature that it "affect[ed] substantial rights of a defendant and impinge[d] on the integrity of the trial process." *State v. Williams*, 190 N.J. Super. 111, 117, 462 A.2d 182, 186 (App. Div. 1983); *see also, e.g., State v. Thompson*, 142 N.J. Super. 274, 280, 361 A.2d 104, 107 (App. Div. 1976) (holding that where a juror has failed "to make a candid response to the inquiry relating to a significant fact of potential bias . . . that defendant has been deprived of a fundamental right to a fair trial and that his conviction cannot stand.").

Here, however, there is nothing before this Court to suggest that Juror No. 13's answers to voir dire questions were not "full and truthful" or that he failed "to make a candid response to [an] inquiry relating to a significant fact of potential bias."  Contrary to Petitioner's assertion that Juror No. 13 gave an inaccurate response in voir dire with regard to his relationship to a law enforcement officer (Pet. 25-26, ECF No. 1-2), the record indicates that Juror No. 13 did not

46

provide any inaccurate responses; and specifically did not know that Mr. Hughes, someone

whom Juror No. 13 knew only as a casual acquaintance, worked as a prosecutor. (Trial Tr.

10:15-19, Colloquy, Mar. 18, 2002, ECF No. 9-80); (The Court: "You probably were unaware of

the fact that he is connected with the same offices in law enforcement." The Juror: "I didn't

know that."); (*id.* at 10:20 – 11:2). Furthermore, as set forth above, there is nothing to suggest

that Juror No. 13's "incidental acquaintanceship" with a prosecutor who was not involved with

Petitioner's case was a significant fact of potential bias. *See Abuhouran*, 162 F.3d at 234 (*supra*).

Finally, as noted above, Petitioner did not move to strike Juror No. 13 at trial after his

association with Mr. Hughes was discovered; nor did Petitioner object to this juror's continued

service on the jury. This Court considers Petitioner's failure to challenge this juror "strong

evidence that he was convinced the juror[] w[as] not biased and had not formed any opinions as

to his guilt." *Beck v. Washington*, 369 U.S. 541, 558, 82 S. Ct. 955, 964, 8 L. Ed. 2d 98 (1962)

(cited in *Skilling v. United States*, 561 U.S. 358, 396, 130 S. Ct. 2896, 2923-24, 177 L. Ed. 2d

619 (2010)). This consideration weakens Petitioner's argument that he would have used a

peremptory challenge to strike Juror No. 13 had he known that Juror No. 13 was incidentally

acquainted with Mr. Hughes.

For these reasons, this Court determines that the state court's denial of Petitioner's claim

that he was unconstitutionally deprived of a peremptory challenge is not contrary to, or an

unreasonable application of, clearly established federal law and Petitioner is not entitled to

habeas relief on this ground.

4. GROUND FOUR: Trial court's failure to remove Juror No. 2 for cause

In his fourth ground for relief, Petitioner asserts that the trial court should have removed a

juror who Petitioner believes was sleeping during trial; or, in the alternative, that the court should

have questioned this juror as to her ability to remain fair and impartial. (Pet. 27-28, ECF No. 1-2).  Petitioner asserts that the sleeping juror denied him his right to a fair and impartial jury.

Respondents contend that "there is no evidence that Juror Number Two was actually sleeping as the transcript is ambiguous, at best." (Resp't 94, ECF No. 9).  Nevertheless, even assuming that Juror No. 2 was sleeping, Respondents assert that the state court judge took appropriate action and remedied the situation (*id.* at 95); that any inattentiveness was harmless because it was not at a point where critical evidence was being presented (*id.* at 96); and that a similar, more detailed instruction was provided at the end of the trial so Petitioner suffered no prejudice (*id.* at 96-97).  Finally, Respondents point out that Petitioner did not request that Juror No. 2 be removed, or replaced, or that she be questioned at trial. (*Id.* at 98).

Both Petitioner and Respondents cite only to New Jersey State law in support of their respective positions.  The question before this Court, however, is one of federal law; specifically, whether Petitioner was deprived of a constitutional right as a result of the sleeping juror.  On direct appeal, the appellate court rejected the argument without providing a discussion. *See State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *2; *see also* N.J. Ct. R. 2:11-3.  As explained above, this issue is presumed to have been adjudicated on the merits. *See Johnson*, 133 S. Ct. at 1094.  This Court concludes that there was no constitutional violation; therefore the state court's rejection of this claim was not contrary to, or an unreasonable application of, Supreme Court precedent.

"The United States Supreme Court has opined that 'a federal court's review into . . . a criminal jury's deliberations is a decidedly limited enterprise,' primarily because '[a]llegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the [trial] process.'" *Durham v. Phelps*,

No. 07-370, 2009 WL 3271370, at *7 (D. Del. Oct. 9, 2009) (quoting *Tanner v. United States*, 483 U.S. 107, 120, 107 S. Ct. 2739, 2747, 97 L. Ed. 2d 90 (1987)).  "Sleeping is a form of jury misconduct, and a defendant must demonstrate both that the juror in question ignored an essential portion of the trial and that the defendant was prejudiced by the juror's misconduct." *United States v. Sheika*, No. 05-cr-67, 2005 WL 2562969, at *4 (D.N.J. Oct. 7, 2005) *aff'd*, 304 F. App'x 135 (3d Cir. 2008) (citing *United States v. Hendrix*, 549 F.2d 1225, 1229 (9th Cir. 1977)); *see also Gaston v. MacFarland*, No. 04-1168, 2005 WL 1828660, at *7 (D.N.J. July 29, 2005).

> It has been held that a sleeping juror should be removed if the sleep has made it "impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial." *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000).  But courts are not automatically required to remove a sleeping juror; instead they have a considerable amount of discretion in determining how to handle the situation. *Id.; see also United States v. Barrett*, 703 F.2d 1076, 1083 (9th Cir. 1982); *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987) ("[e]very incident of juror misconduct does not require a new trial").

*Gaston*, No. 04-1168, 2005 WL 1828660, at *7 (footnote omitted).

The record before this Court with respect to this claim is limited to two statements made by the trial judge: "Would you wake Juror Number Two up, please?  I asked her to wake you up." (Trial Tr. 158:1-2, Colloquy, App. Rta14 – part 2, Mar. 19, 2002, ECF No. 82).  These statements were made during a colloquy given by the trial judge regarding limiting instructions concerning the testimony of one of the State's witnesses and prior inconsistent statements.  No further discussion was had with respect to this juror, or this issue, and neither attorney commented or objected.

Given this record, this Court cannot conclusively determine that Juror No. 2 was, in fact, sleeping at this point in the trial. *See, e.g., Ciaprazi v. Senkowski*, 151 F. App'x 62, 64 (2d Cir. 2005) ("Some greater indication than is currently in the record that [the juror] was, in fact,

asleep, as opposed to daydreaming or concentrating with eyes shut, would have significantly strengthened the argument that a hearing was warranted.").  Moreover, it is evident that even if Juror No. 2 was sleeping, it was not during an essential portion of the trial.  At the time the Court allegedly woke up Juror No. 2, the jury was being given a limiting instruction regarding what to consider in evaluating the prior statement of Brian Hudgins.  This was not a crucial element of either the State's or of Petitioner's case.

Also, as Respondents point out, the jury was again provided with an instruction as to how to evaluate and consider a prior inconsistent statement during the final jury charge. (Trial Tr. 159:23 – 161:10, Mar. 27, 2002, ECF No. 9-91).  Indeed, a comparison of the final jury charge and the colloquy that took place immediately prior to the Court allegedly waking Juror No. 2 reveals that the instructions were substantially similar.  Thus, even if she had been sleeping during the initial colloquy regarding Brian Hudgins, Juror No. 2 ultimately received the instruction regarding prior inconsistent statements.

Additionally, this Court notes that the primary difference between the two instructions is that the colloquy which took place immediately prior to the court allegedly waking Juror No. 2 specifically references the witness, Brian Hudgins, while the jury charge instruction refers to a generic "witness" or "declarant."  This difference is not so significant as to deprive Petitioner of his right to a fair trial. *See, e.g., United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987) (sleeping juror missed testimony that was "insubstantial;" therefore, defendant was not deprived of his right to an impartial jury and a fair trial).  Accordingly, the record before this Court is clear that, even assuming Juror No. 2 was sleeping, Petitioner was not prejudiced by this fact, nor was he denied a fair trial. *See Sheika*, No. 05-cr-67, 2005 WL 2562969, at *5; *see also Anderson v. Terhune*, 409 F. App'x 175, 179 (9th Cir. 2011) (juror's sleep behavior did not rise to the level of

a constitutional violation); *United States v. Ortiz*, No. 92-0592, 1993 WL 303286, at *2 (E.D. Pa. Aug. 5, 1993) *aff'd*, 27 F.3d 560 (3d Cir. 1994) (collecting cases) ("Generally, courts have been reluctant to reverse a conviction or grant a new trial when it has been alleged that jurors have slept during portions of the trial.").

Finally, this Court addresses Petitioner's assertion that, at the least, the trial court should have questioned Juror No. 2 regarding her ability to remain fair and impartial after she had allegedly been asleep. The Court first notes that Petitioner has not cited, and this Court has not found, any Supreme Court decision which mandates that an inquiry must be made into every instance of juror misconduct. Rather, "[a] trial court has the duty to conduct a hearing as to jury impartiality when there is evidence of extraneous influences on the jury." *Jenkins v. Bartkowski*, No. 10-4972, 2014 WL 2602177, at *15 (D.N.J. June 11, 2014) (collecting cases from the Seventh, Eleventh, Sixth and Third Circuits). Here, the potentially sleeping juror does not rise to the level of an "extraneous influence."

Certainly, if such an inquiry or hearing had been conducted, the additional information—as well as a finding that Juror No. 2 was, or was not, asleep—would be helpful to this Court's analysis and review of the state courts' determinations. However, such information is not necessary to resolve this issue. The fact that neither the trial court nor the parties addressed this issue beyond the two statements contained in the transcript suggests, first, that Juror No. 2 may not have been sleeping in the first instance. Second, it suggests that, even if she had been sleeping, it was for such an insignificant period of time, and during such a non-critical point in the trial that no further discussion was warranted. Given the "considerable discretion [afforded to a court] in deciding how to handle a sleeping juror," *see Freitag*, 230 F.3d at 1023, and the absence of Supreme Court precedent suggesting that further inquiry is required in circumstances

such as those presented in this case, this Court cannot determine that the state court's rejection of Petitioner's claim was contrary to, or an unreasonable application of, clearly established federal law.  Petitioner is not entitled to habeas relief on this claim.

C.  <u>GROUND FIVE: Trial Court's failure to instruct jury that Petitioner could be convicted of aggravated manslaughter or manslaughter as an accomplice</u>

As his fifth ground for relief, Petitioner asserts that he was denied his constitutional right to a fair trial when the trial court failed to instruct the jury that Petitioner could be convicted of the lesser included offenses as an accomplice.[12]  Petitioner raised this issue on appeal, and the appellate division was satisfied that this issue did not warrant reversal.  *See State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *2.  The appellate court also expressly declined to discuss the "rather complex, and somewhat convoluted, charge to the jury on accomplice liability and the lesser included offenses, particularly since it was given at defendant's request and over the State's objection." *Id.* at *17.

After the State filed a petition for certification to the New Jersey Supreme Court, Petitioner again raised this issue in his notice of cross-petition. (Notice of Cross-Petition 10, App. Ra15, ECF No. 9-19).  The New Jersey Supreme Court reinstated Petitioner's conviction —thus, rejecting Petitioner's cross-petition—without discussion on the jury charge on accomplice liability and the lesser included offenses. *State v. Burns*, 192 N.J. 312; *see also* N.J. Ct. R. 2:11-3.  As explained above, this issue is presumed to have been adjudicated on the merits. *See Johnson*, 133 S. Ct. at 1094.  Nevertheless, a petitioner's burden "still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.  "[A] habeas court must determine what arguments or theories . . . could have supporte[d] the

---

[12] This argument also forms the basis of Petitioner's Ground Eight.

state court's decision; and then must ask whether it is possible fairminded jurists could disagree

that those arguments or theories are inconsistent with the holding in a prior decision of this

Court." *Cullen*, 131 S. Ct. at 1402 (internal quotation marks and citation omitted).

Respondents assert that Petitioner cannot take issue with the jury instructions because,

"to the extent the jury instructions contained error, that error was plainly invited by petitioner."

(Resp't 104, ECF No. 9).  Although Respondents cite only state law in support of their position,

the Third Circuit has addressed the scenario wherein a defendant complains of alleged errors

which he, himself, induced:

> Under the invited error doctrine, "[a] defendant cannot complain on appeal of
> alleged errors invited or induced by himself." *Console,* 13 F.3d at 660 (citation
> and internal quotation marks omitted).  "[W]here a defendant makes a request in
> favor of certain instructions, he waives the right to complain of error in such
> instructions on appeal." *United States v. Andrews,* 681 F.3d 509, 517 n.4 (3d Cir.
> 2012).  However, we have held that "[w]here a defendant submits proposed jury
> instructions in reliance on current law, and on direct appeal that law is declared
> constitutionally infirm, we will not apply the invited error doctrine.  Instead, we
> will review for plain error." *United States v. W. Indies Transp., Inc.,* 127 F.3d
> 299, 305 (3d Cir. 1997) (citing *Johnson v. United States,* 520 U.S. 461, 465–66,
> 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)); *Andrews,* 681 F.3d at 517 n. 4
> (describing exception as applying to instances in which the law relied on by
> defendant is found to be "constitutionally problematic").

*United States v. Maury*, 695 F.3d 227, 256-57 (3d Cir. 2012); *see also United States v. Console*,

13 F.3d 641, 660 (3d Cir. 1993).

The record in this case demonstrates that instructing the jury with charges of aggravated

manslaughter and reckless manslaughter without an accomplice theory was consistent with

Petitioner's defense theory.  Defense counsel explained that "the jury could infer that even if

they believed that Mr. Burns was doing the things that they said, that he really didn't think that

Tony Felder was going to go over there and kill Patterson[,]" and therefore Petitioner's actions

were "reckless as opposed to purposeful."  (Trial Tr. 299:5-8, 299:20, App. Rta18 – part 2, Mar.

26, 2002, ECF No. 9-89); *see also*  (Trial Tr. 16:8-12, App. Rta 19 – part 1, Mar. 27, 2002, ECF

No. 9-90) ("What I'm saying is I think there's a rational basis for the Jury to come back with aggravated manslaughter or manslaughter [on an independent basis]." (*Id.* at 16:9-12).  In fact, the trial court originally intended to charge Petitioner with accomplice liability as to aggravated and reckless manslaughter. (*Id.* at 13:21 – 14:7).  However, after the prosecution objected to the inclusion of any lesser included offense charges, Petitioner's counsel specifically agreed that the trial court should omit the accomplice charge with respect to aggravated manslaughter or reckless manslaughter. (*Id.* at 16:16-24) ("Quite frankly, I don't know if you can be an accomplice to reckless conduct as opposed to purposeful and knowing conduct.  I haven't totally thought that through.  But I tend to agree with him that the actions that I think if the Jury combed through the record and came to a conclusion that there was reckless conduct on Mr. Burns's part, it would be separate and apart from any accomplice type of theory.").  This appears to have been a strategic move.  Regardless of the motive behind making this request, Petitioner, through counsel, asked the trial court to omit the very instruction which he now alleges was trial error to omit.[13]  Therefore, the invited error doctrine applies. *See, e.g., Maury*, 695 F.3d at 259. ("This is the very situation that the invited error doctrine is intended to address.").

In order to avoid application of the invited error doctrine, Petitioner must show that the law he, through his defense counsel, relied on in proposing the instruction for aggravated manslaughter and reckless manslaughter has since been found to be "constitutionally problematic." *See Andrews*, 681 F.3d at 517 n.4.  However, Petitioner makes no such argument.  Rather, he argues simply that the jury should have been given an additional instruction as to accomplice liability even though he, through counsel, requested otherwise at trial.  Because there is no Supreme Court precedent establishing that the law relied on in developing the instruction

---

[13] Petitioner does not assert an ineffective assistance of counsel claim in this habeas petition.

given to the jury is constitutionally problematic or deficient, *see* N. J. STAT. ANN. 2C:11-4(a), (b), and because Petitioner has failed to demonstrate as much, he cannot avoid application of the invited error doctrine and he is not entitled to habeas relief. *See, e.g., Reddick v. Warren*, No. 12-7875, 2016 WL 29261, at *12 n.3 (D.N.J. Jan. 4, 2016) (holding that the invited error doctrine would have precluded habeas relief because petitioner, through counsel, consented to and approved of the course of action taken at trial); *Cusumano v. McFarland*, No. 04-5080, 2006 WL 1455785, at *5 (D.N.J. May 18, 2006) (citing *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998) (holding that where a defendant requested a particular instruction and then argued that the giving of said instruction was error, habeas relief was precluded)).

Further, Petitioner's reliance on *State v. Bielkiewicz*, 267 N.J. Super. 520, 632 A.2d 277 (1993), is misplaced.  As the opinion of a state court, its holding is not determinative of this issue on federal habeas review.  Also, in *Bielkiewicz*, the New Jersey Appellate Division determined that "an accomplice-liability charge 'must include an instruction that a defendant can be found guilty as an accomplice of a lesser included offense even though the principal is found guilty of the more serious offense.'" *Duncan v. Morton*, 256 F.3d 189, 202 (3d Cir. 2001) (quoting *State v. Norman*, 151 N.J. 5, 37, 697 A.2d 511, 526 (1997)).  As set forth above, however, Petitioner elected, through counsel, to be charged with the offenses of aggravated manslaughter and reckless manslaughter on an independent basis—without an accomplice liability theory. Therefore, *Bielkiewicz*, which provides instruction on the adequacy of an accomplice liability charge, would not apply to the instant case where Petitioner chose to forgo that charge.

Petitioner cites to no Supreme Court precedent which stands for the proposition that when a defendant explicitly chooses to forgo being charged under an accomplice theory on lesser included offenses at trial, he is still constitutionally entitled to an accomplice liability charge—

even though such a charge would be inconsistent with his defense theory.  Moreover, "the

Supreme Court has never held that the Due Process Clause mandates lesser-included-offense

instructions in non-capital cases like his." *Walker v. Bartowski*, No. 11-0400, 2014 WL 2094027,

at *10 (D.N.J. May 20, 2014), *certificate of appealability denied* (May 11, 2015) (collecting

cases).  "Where the Supreme Court has not held that a particular jury instruction, or failure to

give that instruction, is unconstitutional, there is no right to habeas relief." *Id.* (citing *Smith v.

Spisak,* 558 U.S. 139, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010) (declining to grant habeas relief

based where jury instructions were not "previously held . . . unconstitutional")).

   For the foregoing reasons, to the extent this claim is cognizable on federal habeas review,

the New Jersey Supreme Court's rejection of Petitioner's claim regarding the accomplice

liability charge was not contrary to, or an unreasonable application of, Supreme Court precedent

and Petitioner is not entitled to habeas relief on this claim.

   D.   GROUND SIX:  Petitioner's State constitutional rights were violated when he was
        convicted of murder, a crime which was not charged by the grand jury

   In his sixth claim for relief, Petitioner asserts that he was convicted of a crime which was

not charged to the grand jury.[14]  Notably, in this claim Petitioner specifically asserts that his *state*

constitutional rights were violated, and he cites only to state statutes.  Likewise, Respondents

rely only on state law in their opposition.  However, as set forth above, federal habeas review is

concerned with whether there has been a violation of federal law. *See* 28 U.S.C. § 2254(a) ("[t]he

Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application

for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State

---

[14] It appears that Petitioner failed to raise this issue before the state courts; therefore, this claim is unexhausted.  Nevertheless, it will be denied on the merits. *See* 28 U.S.C. § 2254(b)(2).

court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").  Claims based on errors of state law are not cognizable on federal habeas review, and federal courts cannot re-examine state court determinations on state law issues. *Estelle v. McGuire*, 502 U.S. at 67–8; *Pulley v. Harris*, 465 U.S. 37, 41, 104 S. Ct. 871, 79 L.Ed.2d 29 (1984); *Riley v. Taylor*, 277 F.3d 261, 310 n.8 (3d Cir. 2001).  Because the Fifth Amendment right to a grand jury indictment does not apply to state criminal prosecutions,[15] federal courts conducting habeas review are confined "to a determination of whether due process requirements have been satisfied."  *U.S. ex. rel Wojtycha v. Hopkins*, 517 F.2d 420, 425 (3d Cir. 1975).

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend VI.  This right applies to the states through the Fourteenth Amendment.  *In re Oliver*, 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682 (1948).  Consequently, a state prisoner has a right to adequate notice of the charges against which he must defend; and this general principle is well established in Supreme Court precedent. *See Gray v. Netherland*, 518 U.S. 152, 167, 116 S. Ct. 2074, 2083, 135 L. Ed. 2d 457 (1996); *Russell v. United States*, 369 U.S. 749, 763–764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *In re Oliver*, 333 U.S. 257; *Cole v. Arkansas*, 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal.").

---

[15] *See Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); *Hurtado v. California*, 110 U.S. 516, 4 S. Ct. 111, 28 L. Ed. 232 (1884).

Therefore, although a state is constitutionally free to dispense with the grand jury indictment altogether and may proceed on a prosecutor's information if it so chooses, *see United States ex rel. Wojtycha*, 517 F.2d at 425 (citing *Beck v. Washington*, 369 U.S. 541, 545, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962)), a defendant remains entitled to proper notice of the charges he faces, whether by information or indictment. *See e.g., Gray*, 518 U.S. 152; *Cole v. Arkansas*, 333 U.S. 196.

Here, Petitioner asserts that, "because the prosecution failed to indict petitioner for being an accomplice to murder, [] he could not be prosecuted for murder via being an accomplice." (Pet. 33, ECF No. 1-2). In order to succeed on this habeas claim, Petitioner must point to Supreme Court case law which establishes that a prosecutor must present to the grand jury for indictment, or otherwise spell out in the indictment document, the precise theory of liability under which it intends to convict a defendant. However, Petitioner has not cited to any Supreme Court precedent—and the Court can find none—which stands for this proposition. *See Lopez v. Smith*, 135 S. Ct. 1, 5, 190 L. Ed. 2d 1 (2014) ("Absent a decision of ours clearly establishing the relevant standard, the Ninth Circuit had nothing against which it could assess, and deem lacking, the notice afforded respondent by the information and proceedings.").

Rather, as set forth above, relevant Supreme Court case law requires only, in general terms, that a defendant is entitled to notice of the charges against him. *See Russell*, 369 U.S. at 763-64; *In re Oliver*, 333 U.S. at 273; *Cole*, 333 U.S. at 201. In examining Petitioner's Indictment in this case, this Court finds that Petitioner was afforded sufficient notice to satisfy the more general notice requirement set forth in *Russell*, *In re Oliver*, and *Cole*. Specifically, Count One of Petitioner's Indictment alleges that Petitioner "did purposely or knowingly cause the death of or serious bodily injury resulting in the death of the said Rodney Patterson contrary

to the provisions of N.J.S. 2C:11-3a(1) or 2C:11-3a(2), and against the peace of this state, the government and dignity of the same." (Indictment 2, App. Ra1, ECF No. 9-5).  Thus, the Indictment clearly identified the charge against Petitioner; contained the elements of the offense charged; and protected against double jeopardy. *See Russell*, 369 U.S. at 763-64 (setting forth criteria by which the sufficiency of a *federal* indictment is to be measured)[16].

Accordingly, Petitioner has failed to show that he was denied due process or deprived of any other federally protected right due to the prosecutor's failure to set forth in the indictment the precise theory of liability under which it intended to convict Petitioner. *See, e.g., Still v. Hastings*, No. 13-6226, 2015 WL 3934937, at *9 (D.N.J. June 26, 2015) *certificate of appeal denied by Still v. Adm'r of N.J. State Prison,* C.A. No. 15-2986 (3d Cir. Feb. 19, 2016) (quoting *Smith,* 135 S. Ct. at 4.) ("Similar to the Supreme Court's holding in *Smith,* this Court now determines that the general proposition that a defendant is entitled to notice of the charges against him "is far too abstract to establish clearly the specific rule [Petitioner] needs.").  The Indictment in this case afforded Petitioner sufficient notice to satisfy the general notice requirement set forth in *Russell*, *In re Oliver*, and *Cole*.  *See Russell*, 369 U.S. at 763-64; *In re Oliver*, 333 U.S. at 273; *Cole*, 333 U.S. at 201.  Therefore, there was no constitutional violation and Petitioner is not entitled to habeas relief on this ground.

---

[16] This Court notes that *Russell* specifically addressed the adequacy of a *federal* indictment and that the Supreme Court clarified in *Lopez v. Smith*, 135 S. Ct. at 4, that it has not established a specific standard by which a court can evaluate notice afforded to a defendant in a state indictment, information or proceedings.  This Court cites the criteria set forth in *Russell* solely for the limited purpose of determining whether the notice afforded to Petitioner in this case was sufficient to satisfy the general proposition that a defendant is entitled to notice of the charges against him precedent.

E.  GROUND SEVEN: Petitioner was denied due process when a combination of inferences of Petitioner's guilt were introduced into evidence

In his seventh ground for relief, Petitioner argues that the cumulative effect of several alleged errors at trial denied him of his constitutional right to a fair trial.[17]  The three errors Petitioner references are: (1) testimony from Tony Felder's defense counsel regarding Felder's guilty plea; (2) the prosecution's statement "to the jury that a witness['s] refusal to answer questions represents the truth;" and (3) an instruction to the jury that a "witness['s] failure to answer questions regarding Petitioner's guilt could be inferred as evidence of Petitioner's guilt." (Pet. 34, ECF No. 1-2).

As explained in other parts of this Opinion, the individual errors alleged by Petitioner do not entitle Petitioner to habeas relief.  Specifically, Petitioner's claim regarding the testimony of Tony Felder's defense counsel is discussed in this Court's rejection of Petitioner's Ground Eleven, *infra*.  Likewise, Petitioner's claims regarding the witness's refusal to answer questions—both the prosecutor's statements and the jury instructions regarding same—were rejected in this Court's discussion of Petitioner's Ground One, *supra*.  However, "[i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process." *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008); *see also United States v. Roland*, 545 F. App'x 108, 117 (3d Cir. 2013).  "Reversal is warranted only when '[the ] errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" *Roland*, 545 F. App'x at 117 (quoting *United*

---

[17] It appears that Petitioner failed to raise this issue before the state courts; therefore, this claim is unexhausted.  Nevertheless, it will be denied on the merits. *See* 28 U.S.C. § 2254(b)(2).

*States v. Hill,* 976 F.2d 132, 145 (3d Cir. 1992)); *see also Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 1721, 123 L. Ed. 2d 353 (1993)) ("Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'").

As discussed in detail in the Court's analysis of Petitioner's first ground for relief, there is substantial and significant evidence of Petitioner's guilt in the record in this case. Therefore, even combining these three alleged errors—and assuming they do, in fact, constitute errors—this Court finds that the alleged errors did not have a substantial influence on the outcome of the trial, *see Roland*, 545 F. App'x at 188, or result in a cumulative prejudice which undermined the reliability of the verdict, *see Albrecht*, 485 F.3d at 139. Accordingly, there was no constitutional violation and Petitioner is not entitled to habeas relief on this ground.

F. GROUND EIGHT: The trial court erred and directed a verdict by instructing the jury that the accomplice liability charge only applied to murder and not to the lesser included offenses.

In Ground Eight Petitioner sets forth substantially the same argument as he does in Ground Five. Therefore, for the same reasons discussed above, Petitioner is not entitled to habeas relief on this ground.

G. GROUND NINE: The trial court erred by admitting the testimony of Bobby Bryant that he was in fear for the safety of his family.

In his ninth claim for relief, Petitioner contends that the State's witness, Bobby Bryant, offered prejudicial character testimony which denied Petitioner of his constitutional right to a fair trial. Specifically, Petitioner contends that Mr. Bryant's testimony implied that Petitioner was

"socially dangerous and that he would retaliate against anyone who told or testified against him[.]" (Pet. 40, ECF No. 1-2). "Petitioner argues that the probative value of the testimony was far outweighed by the prejudice he suffered." (*Id.* at 41). Petitioner cites only to New Jersey State law in support of this claim.

Respondents argue that Mr. Bryant's testimony did not imply that Petitioner was a threat, therefore, the admission of his testimony was not prejudicial to Petitioner. Respondents provide an analysis under state law and conclude that the appellate division's rejection of this claim did not violate Petitioner's federal rights.

The state appellate court rejected this argument without providing a discussion. *See State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *2; *see also* N.J. Ct. R. 2:11-3. As explained above, this issue is presumed to have been adjudicated on the merits. *See Johnson*, 133 S. Ct. at 1094.

Generally, claims alleging state court error in the admission of evidence are not cognizable in a federal habeas proceeding. *See Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court, however, cannot decide whether the evidence in question was properly allowed under the state law of evidence."). Rather, "[a] federal habeas court is limited to deciding whether the admission of the evidence rose to the level of a due process violation." *Id.*; *see also Estelle v. McGuire*, 502 U.S. 62; *Lesko v. Owens*, 881 F.2d 44, 51 (3d Cir. 1989) (collecting cases). "Accordingly, a reviewing court must examine the relative probative and prejudicial value of evidence to determine whether its admission violated defendant's right to a fair trial." *Lesko*, 881 F.2d at 51.

The specific testimony which Petitioner asserts denied him of a right to a fair trial is the following:

PROSECUTOR:  How do you feel today, sir, about being here in this courtroom
with your friend, Ronald Burns, and testifying against him?  Tell us how
you feel about that.

BRYANT:  I'm really, I'm just doing what's right basically.

PROSECUTOR:  When the police came to see you some time the day after the
shooting, which was September 7th, Tuesday, you indicated you believe it
was Detective Mastrangelo?

BRYANT:  Correct.

PROSECUTOR:  Your words were you beat around the bush with Detective
Mastrangelo?

BRYANT: Correct.

PROSECUTOR:  And the reason you beat around the bush with Detective
Mastrangelo was why, sir?

BRYANT:  Because I was scared.

PROSECUTOR:  And you were scared about what, Mr. Bryant?

BRYANT:  As far as me having his gun in my possession. Just scared in general,
just if I was to say something and I was scared my family would be in
danger, just a lot of things.

(Trial Tr. 155:12 – 156:8, App. Rta11 – Part 2, Mar. 13, 2002, ECF No. 9-77).

Petitioner argues that this testimony provided by Mr. Bryant was prejudicial because

"[t]he clear implication from this testimony is that this witness fear[ed] for the safety of his

family if he was to say anything about what had occurred." (Pet. 41, ECF No. 1-2).  However, as

Respondents point out, Mr. Bryant's testimony continued and he provided further clarification as

to the reason he felt scared:

PROSECUTOR:  Is – what was your fear about what the police might think about
if you told them the truth about you giving the gun to Black?

BRYANT:  It's what you just said.

PROSECUTOR: Which is what? Tell us.

BRYANT:  About me handing the gun.

> PROSECUTOR:  It might --
>
> BRYANT:  And having it in my possession, period.
>
> PROSECUTOR:  It might paint the wrong picture?
>
> BRYANT:  Pretty much.
>
> PROSECUTOR:  And it might paint the wrong picture, sir, that your instincts were to wipe the prints off the gun when you were ready to give it to Black?
>
> BRYANT:  Yes.

(*Id.* at 157:6-23).

Given this additional testimony and clarification from Mr. Bryant, this Court is not persuaded by Petitioner's argument that "[t]he only reasonable conclusion to be drawn from this testimony was that [Petitioner] . . . was dangerous." (Pet. 42, ECF No. 1-2).  Rather, the testimony suggests that the fear Mr. Bryant expressed was a fear that if he told the truth about the gun to police he may be implicated in the crime, or otherwise face legal repercussions, for handling the gun.   Therefore, the record does not support Petitioner's assertion that Mr. Bryant's testimony had a clear prejudicial impact or caused "irreparabl[e] harm." (*Id.*).  Moreover, in light of the fact that Mr. Bryant was an important witness for the State, the potential prejudicial value of this testimony, if any, did not outweigh the probative value of Mr. Bryant's testimony, and did not otherwise deny Petitioner of his right to a fair trial. *See Keller*, 251 F.3d at 416 n.2; *Lesko v.*, 881 F.2d at 51.  Accordingly, the state court's rejection of Petitioner's claim regarding Mr. Bryant's testimony was not contrary to, or an unreasonable application of, Supreme Court precedent and Petitioner is not entitled to habeas relief on this claim.

H.  <u>GROUND TEN: The trial court erred by admitting the testimony of Curtis Calhoun</u>

In his tenth ground for relief, Petitioner asserts that the trial court improperly allowed Curtis Calhoun to testify that Tifani Young had asked Calhoun to create an alibi for him.  The

state appellate court rejected this argument without providing a discussion. *See State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *2; *see also* N.J. Ct. R. 2:11-3. As explained above, this issue is presumed to have been adjudicated on the merits. *See Johnson*, 133 S. Ct. at 1094.

Also, as explained above, claims alleging state court error in the admission of evidence are generally not cognizable in a federal habeas proceeding. *See Keller v. Larkins*, 251 F.3d at 416 n.2. Accordingly, this court's review "is limited to deciding whether the admission of the evidence rose to the level of a due process violation." *Id.*; *see also Lesko*, 881 F.2d at 51.

Specifically, Petitioner takes issue with the following testimony:

PROSECUTOR: Let's come back to the topic of the false alibi that Fani coached you with for lack of a better term, okay? You are nodding your head?

CALHOUN: Yes.

PROSECUTOR: Would you agree that essentially Fani coached you about the alibi?

CALHOUN: Yes.

PROSECUTOR: Now, it's clear that Fani in the made-up fiction or the made-up alibi story doesn't have himself with Black and Tone, correct?

CALHOUN: Correct.

PROSECUTOR: But is it also clear that part of this fiction was to create a false alibi for Tone, Little Tone, and Black?

CALHOUN: Yes.

PROSECUTOR: In that we all get together in Philadelphia. All four of us, including Tone and Black and we are over their partying together as part of the false alibi?

CALHOUN: Yes.

PROSECUTOR: Not just for Fani. The false alibi was also for the defendant and for Little Tone?

CALHOUN: Yes.

PROSECUTOR: 'cause, in fact, you were never over in Philly that night?

CALHOUN:  Correct.

(Trial Tr. 171:25 – 173:6, App. Rta10, Mar. 12, 2002, ECF No. 9-75).

Petitioner argues that this testimony was erroneously admitted to "establish petitioner's consciousness of guilt." (Pet. 47, ECF No. 1-2).  Petitioner states that he "was not privy to, nor condoned the discussions between Mr. Young and Mr. [Calhoun][18]" and that the "false alibi in questions [sic] was designed to protect only Mr. Young." (*Id.*).  This argument fails to establish any constitutional violation.

As an initial matter, this Court notes that the jury in this case was not instructed that Calhoun's testimony regarding the false alibi could be considered as tending to prove Petitioner's consciousness of guilt.  Regardless, Petitioner has not cited to any Supreme Court precedent which prohibits the introduction of such testimony for consciousness of guilt purposes—or for any other purposes.  Although Petitioner complains that "he was not privy to" nor did he condone the discussion between Mr. Young and Mr. Calhoun, Petitioner has not provided any explanation as to how the introduction of this testimony denied him due process.

Additionally, even assuming that Calhoun's testimony had a prejudicial impact, the Court notes that defense counsel had the opportunity to cross-examine Calhoun.  During this cross-examination, defense counsel elicited testimony to establish that Tifani Young instructed Calhoun to tell police that Young and Calhoun were in Philadelphia and, while they were there, Petitioner and Little Tone drove there and joined them. *See* (Trial Tr. 185:1 – 186:9, App. Rta10, Mar. 12, 2002, ECF No. 9-75).  Thus, the jury was aware that Petitioner was not "privy to" the conversation which produced the false alibi and that Young created the story to "separate[e]

---

[18] In his Petition, Petitioner refers to this conversation as a discussion between "Mr. Young and Mr. Byrant." (Pet. 47, ECF No. 1-2).  This appears to be a typo as this particular claim for relief relates to the discussions between Mr. Young and Mr. Calhoun.

himself from [Petitioner and Felder]." (Pet. 47, 46, ECF No. 1-2).  This fact further supports the state court's conclusion that the admission of Calhoun's testimony did not deny Petitioner of his right to a fair trial.

Finally, this Court again notes the significant amount of evidence establishing Petitioner's guilt in this case.  In light of the other evidence of Petitioner's guilt available to the jury, Petitioner is unable to show that admission of Calhoun's testimony regarding a false alibi constructed by Tifani Young resulted in actual prejudice. *See Brecht*, 507 U.S. at 637. Accordingly, the state courts' rejection of this claim was not contrary to, or an unreasonable application of, Supreme Court precedent, and Petitioner is not entitled to habeas relief on this ground.

I. <u>GROUND ELEVEN: Testimony of Tony Felder's defense counsel should have been deemed inadmissible</u>

In his eleventh ground for relief, Petitioner takes issue with the fact that the prosecution called Anthony Felder's defense counsel to testify regarding the Felder's plea agreement. Petitioenr asserts that by giving this testimony, "Mr. Felder's defense counsel impermissibly bolstered the credibility of Mr. Felder." (Pet. 49, ECF No. 1-2).  Petitioner also complains that defense counsel "introduced evidence that [the] sentencing process would allow for consideration [of] whether or not Mr. Felder had been influenced by someone more mature than him." (*Id.*).  While Petitioner concedes that the influence of someone more mature is a mitigating factor for sentencing, Petitioner asserts that this information had no probative value at Petitioner's trial, and served only to inject undue prejudice.  Finally, Petitioner argues that this testimony also served to bolster Felder's testimony regarding "how he looked up to petitioner and wanted to be like petitioner[.]" (*Id.* at 51).

In opposition to this claim, Respondents assert that evidence of a co-defendant's or witness's guilty plea may be properly admitted at trial as evidence of the credibility of that witness.  Respondents point out that Petitioner's counsel had the opportunity to cross-examine Felder in order to impeach his credibility.  Further, Respondents assert that testimony regarding the fact that Felder had been informed that the sentencing court could consider whether Felder's conduct was influenced by someone more mature did not serve to bolster Felder's credibility.  Finally, Respondents assert that Petitioner's argument that he was prejudiced because Felder's defense counsel relayed the plea agreement to the jury is without merit.  Respondents argue that, contrary to Petitioner's assertions, defense counsel did not enjoy an "enhanced credibility" in the instant case.

On appeal, the state appellate court "recognized the danger that a jury may view testimony about a co-defendant's guilty plea as substantive evidence of the guilt of the defendant who is on trial." *State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *16 (citation omitted).  The state appellate court noted that the trial judge "was obliged to give the jury a proper cautionary instruction as to the limited use of this testimony for credibility purposes, even in the absence of . . . a request therefor by defendant[ ]." *Id.* (citations and quotations omitted).  Although no such instruction was given in this case, the appellate court was "not convinced that sufficient prejudice flowed from this aspect of the case to require reversal . . ." *Id.*  The New Jersey Supreme Court denied certification of this issue. (Order Denying Certification, App. Ra17, Sept. 8, 2006, ECF No. 9-21).   For the reasons that follow, this Court finds that the state court's rejection of this claim was not contrary to, or an unreasonable application of, existing Supreme Court precedent.

At the outset, this Court notes that Petitioner does not cite to any Supreme Court precedent in his Petition and, instead, focuses on New Jersey State law.  However, as explained earlier, in federal habeas review the relevant inquiry is whether there has been a violation of federal law. *See* 28 U.S.C. § 2254(a).  Claims based on errors of state law are not cognizable on federal habeas review, and federal courts cannot re-examine state court determinations on state law issues. *See Estelle v. McGuire*, 502 U.S. at 67–8.  Petitioner has failed to cite to any Supreme Court case law which would entitle him to habeas relief on this claim.[19]

Instead, in support of his argument that "[i]ntroducing the [sic] Mr. Felder's plea agreement via Mr. Felder's defense counsel impermissibly bolstered the credibility of Mr. Felder," Petitioner relies primarily[20] on a New Jersey Supreme Court case, *Neno v. Clinton*, 167

---

[19] This Court notes that in the Third Circuit, "[i]t is well-established that a co-defendant's guilty plea is not admissible to prove the defendant's guilt." *Gov't of Virgin Islands v. Mujahid*, 990 F.2d 111, 115 (3d Cir. 1993) (citing *United States v. Werme*, 939 F.2d 108, 113 (3d Cir. 1991)). Additionally, if evidence of a plea agreement is introduced for another, permissible purposes, such as to allow the jury to accurately assess the credibility of the witness, *see United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 665 (3d Cir. 2000) (citing *United States v. Gambino*, 926 F.2d 1355, 1363 (3d Cir. 1991)), then Third Circuit case law requires the district court to instruct the jury regarding the limited purpose for which that evidence may be used. *See Mujahid*, 990 F.2d at 115-16.  No such instruction was given in this case.  However, as set forth above, in the context of a federal habeas petition this Court's review is limited to whether or not the state court's decision violated clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).  Therefore, Third Circuit case law is unhelpful to Petitioner's claim for habeas relief. *See, e.g., Lopez v. Smith*, 135 S. Ct. 1 (holding that the Ninth Circuit improperly relied on its own precedent in granting federal habeas relief); *Parker v. Matthews*, 132 S. Ct. 2148, 2155, 183 L. Ed. 2d 32 (2012) ("The Sixth Circuit also erred by consulting its own precedents, rather than those of this Court, in assessing the reasonableness of the Kentucky Supreme Court's decision.").

[20] Petitioner also cites *State v. Johnson*, 120 N.J. 263, 295, 576 A.2d 834, 851 (1990) in support of this claim.  *Johnson*, however, dealt with a situation in which a witness attempted to bolster the credibility of his lay-opinion of a footprint by introducing evidence of his qualifications in fingerprint analysis.  Therefore, the holding in *Johnson* is inapplicable to the case at hand. *Id.* ("Our ruling is narrowly limited to the impropriety of resting Broughter's conclusions about the shoeprint on his expertise in fingerprint analysis, and the possibility that his qualification as an

N.J. 573, 772 A.2d 899 (2001).  Petitioner's reliance is misplaced.  First, as stated above, the

holding in *Neno* is not dispositive of this issue on federal habeas review because it is the opinion

of a state supreme court.  Petitioner has not cited, and this Court cannot find, any Supreme Court

case which addresses the specific issue of whether the testimony of a codefendant's counsel

regarding the codefendant's guilty plea agreement bolsters the credibility of codefendant's

forthcoming testimony. *See Woods v. Donald*, 135 S. Ct. 1372, 191 L. Ed. 2d 464 (2015)

(holding that if no Supreme Court decision confronted the specific question presented by a state

prisoner's federal habeas petition, the state court's decision could not be "contrary to" any

holding from the Supreme Court, as would provide basis for federal habeas relief).[21]

Second, this Court finds the circumstances of *Neno* to be factually distinguishable from

those present in this case.  In *Neno*, which was a personal injury action resulting from an

automobile accident, a law enforcement officer who was trained in accident investigation

testified that he believed plaintiffs caused the accident.  The Supreme Court of New Jersey

concluded that this testimony was inadmissible, and reversal was required, because "[t]he jury

could have ascribed almost determinative significance to that opinion, which went to the heart of

the case." *Neno*, 167 N.J. at 587.

---

expert in fingerprint analysis served no other purpose than to bolster the credibility of his
footprint testimony.").

[21] This Court does not construe this ground as asserting a claim of improper vouching. *See Lawn
v. United States*, 355 U.S. 339, 359 n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958) (holding that
vouching is a type of prosecutorial misconduct in which the prosecuting attorney assures the jury
of the credibility of a government witness through personal knowledge or by other information
outside of the testimony before the jury).  Here, Petitioner does not allege that either attorney—
the prosecutor or Felder's defense counsel—explicitly assured the jury of Felder's credibility.
Nevertheless, to the extent Petitioner meant to assert such an argument, it would likewise be
denied for the reasons discussed.

Here, however, Felder's counsel, Kevin Walker, Esq., simply relayed the specifics of Mr. Felder's plea agreement.  Unlike the witness in *Neno*, Mr. Walker did not offer any "opinion testimony" regarding the truthfulness of Felder's testimony which may have had determinative significance to the jury.  In fact, Mr. Walker specifically testified on cross examination that nothing in the plea agreement determined that Felder's testimony would be truthful; rather, he stated that "the Court would have to ultimately determine [the truthfulness] as a part of the review of the plea agreement at sentencing." (Trial Tr. 213:3-8, Testimony of Kevin Walker, App. Rta14 – part 2, Mar. 19, 2002, ECF No. 9-82).

Further, Petitioner had the opportunity to cross examine both Mr. Walker and Mr. Felder. During these lengthy cross examinations, counsel for Petitioner elicited testimony from both Mr. Walker and Mr. Felder which established that the plea agreement did not guarantee the truthfulness of Felder's testimony. *See id.;* (Felder Testimony 124:1-11, ECF No. 9-86) (Q: "OK. And what is your understanding as to why [sentencing after Petitioner's trial is] part of the agreement?"  A: "Make sure I don't go in telling lies.  So I got to get the trial over before I get sentenced."  Q: "And, who decides whether you tell lies or not?"  A: "The judge."  Q: "So that there's a hearing at some point and there's a determination as to whether or not you told the truth and then – you'll be sentenced?"  A: "Yes, sir.").  In light of the testimony—especially Mr. Walker's admission—that Felder's plea agreement did not guarantee the truthfulness of Felder's testimony, Petitioner has failed to show that Mr. Walker's testimony regarding Felder's plea agreement served to bolster Felder's credibility. *See, e.g., Lam v. Kelchner*, 304 F.3d 256, 273 (3d Cir. 2002) (denying habeas relief where prosecutor read plea agreement into evidence because petitioner did not point out a portion of the plea agreement that had the improper effect of assuring the jury that witness's testimony was credible).

Because Petitioner has not established that he suffered any prejudice, *see Brecht*, 507 U.S. at 637, and because Petitioner cannot demonstrate that the state court's rejection of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, *see Woods v. Donald*, 135 S. Ct. at 1377, he is not entitled to habeas relief on this ground.

With respect to Petitioner's argument regarding Mr. Walker's references to the mitigating factors a sentencing court will look at when making a sentencing decision, Petitioner fails to establish how this testimony violated his constitutional rights. Petitioner specifically takes issue with Mr. Walker's testimony that the sentencing process would allow for consideration of the youthfulness of a particular defendant, and whether or not a defendant had been influenced by someone more mature. Petitioner argues that "this testimony and legal analysis provided only to serve to impermissibly bolster Felder's testimony and paint petitioner as the person who influenced Mr. Felder." (Pet. 49, ECF No. 1-2). Petitioner asserts that, although this was the prosecution's theory at trial, this testimony should not have been admitted.

Again, Petitioner has failed to cite to any Supreme Court precedent in support of this claim. This Court has not found any Supreme Court holdings which address the issue of whether a codefendant's counsel's testimony regarding the potential mitigating and aggravating factors available to his client is prejudicial. *See Woods v. Donald*, 135 S. Ct. 1372. Moreover, Mr. Walker merely explained, in a general sense, the aggravating and mitigating factors that a court will balance when sentencing a defendant. He did not provide any testimony stating that Petitioner, specifically, was the more mature individual who influenced the youthful defendant Felder. Rather, Mr. Walker stated simply that he was permitted to argue these mitigating factors

on behalf of his client.  Petitioner has failed to demonstrate that this testimony was so prejudicial as to deny him a fair trial.

Because Petitioner cannot show that the state court's rejection of Petitioner's claim regarding Mr. Walker's testimony was contrary to, or an unreasonable application of, clearly established federal law, Petitioner is not entitled to habeas relief on this claim.

J.   GROUND TWELVE: Prosecutor improperly advised the jury during summation that if they found Petitioner guilty of murder, he was also guilty of the weapons offense

In his twelfth claim for relief, Petitioner asserts that the prosecutor made an "inaccurate statement of law" during his summation, which the trial court failed to correct. (Pet. 53, ECF No. 1-2).  Thus, Petitioner sets forth a claim for prosecutorial misconduct which denied him of his right to a fair trial.  Specifically, Petitioner takes issue with the following statements made by the prosecutor:

> There are three other crimes, the hindering apprehension we talked about; possession of the gun; possession for a[n] unlawful purpose.  I don't think we need to spend a lot of time on that.  It's very evident from the facts.  If you find him guilty of murder, and I would submit, that it should fall into place.  The facts would suggest that he's guilty also of possession of a handgun.  He had no permits to carry and also possession with an unlawful purpose to -- to use it to kill.  And that's what -- what all it was here.

(Trial Tr. 143:13-22, Summation, App. Rta19 – part 2, Mar. 27, 2002, ECF No. 9-91).

Petitioner argues that these comments "had the clear capacity to lead the jury to an unreasonable belief that if they determined that petitioner was guilty of murder . . . he was automatically guilty of possession of [a] weapon and possession of the weapon for an unlawful purpose." (Pet. 55, ECF No. 12).

Respondents argue that Petitioner misinterprets the prosecutor's summation. (Resp't 166, ECF No. 9).  Respondents assert that the comments challenged by Petitioner merely expressed the prosecutor's opinion that there was sufficient evidence to find petitioner guilty of both

murder and the weapons offenses.  Respondents contend that the prosecutor did not, as Petitioner

suggests, instruct the jury that if they found Petitioner guilty of murder they must also convict

him of the weapons offense.  Respondents further assert that even if such an improper instruction

had been given, the jury did not adhere to that mandate, as evidenced by the fact that they

acquitted Petitioner of one of the weapons offenses, third degree unlawful possession of a

weapon.

The state appellate court rejected this argument without providing a discussion. *See State

v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *2; *see also* N.J. Ct. R. 2:11-3.  As explained

above, this issue is presumed to have been adjudicated on the merits. *See Johnson*, 133 S. Ct. at

1094.  Given the record in this case, this Court is satisfied that the appellate division's rejection

of Petitioner's claim of prosecutorial misconduct was not contrary to, or an unreasonable

application of, Supreme Court precedent.

In assessing a claim for prosecutorial misconduct on habeas review, this Court looks to

the test articulated by the Supreme Court in *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct.

2464, 91 L.Ed.2d 144 (1986).  In *Darden*, the Court held that "the relevant question is whether

the prosecutors' comments so infected the trial with unfairness as to make the resulting

conviction a denial of due process." *Id.* at 180 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637,

94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)); *see also Lam v. Kelchner*, 304 F.3d at 271.

Based on the record in this case it is evident that the prosecutor's comments did not

amount to an "inaccurate statement of law," as Petitioner alleges.  Rather, as Respondents argue,

these comments amount to a suggestion by the prosecutor that the evidence in the case permitted

a conviction of both murder and the weapons offenses. *See, e.g.,* (Trial Tr. 143:17-20,

Summation, App. Rta19 – part 2, Mar. 27, 2002, ECF No. 9-91) ("If you find him guilty of

murder, and I would submit, that it should fall into place.  The facts would suggest that he's guilty also of possession of a handgun."); *see also, e.g., Werts v. Vaughn*, 228 F.3d 178, 205 (3d Cir. 2000) ("We find the prosecutor was merely attempting to point out reasonable inferences from the evidence presented at trial."); *United States v. Werme*, 939 F.2d 108 (3d Cir. 1991) (holding that prosecutor is entitled to considerable latitude in summation to argue evidence and any reasonable inferences that can be drawn from that evidence).

In his brief, Petitioner recites the statutes for possession of a weapon, N.J. STAT. ANN. 2C:39-5(b), and possession of a weapon for an unlawful purpose, N.J. STAT. ANN. 2C:39-4(a), and suggests that, due to the prosecutor's comments, Petitioner's conviction for these offenses was not predicated on the legal requirements established by these statutes, but on the finding of guilt for the substantive offense of murder.  This argument is unpersuasive for several reasons. First, a plain reading of the comments challenged by Petitioner—which do not address the elements of these offenses and which only suggest an inference regarding the evidence in this case—cannot be interpreted to improperly shift the burden of proof required for a conviction on these offenses.  Contrary to Petitioner's allegations, nothing in the prosecutor's summation affirmatively instructs the jury that a finding of guilt as to murder automatically requires a finding of guilt as to the weapons offenses.

Next, as Respondents point out, the jury acquitted Petitioner of one of the weapons offenses.  Therefore, to the extent the prosecutor's comments could be perceived as improper, *see, e.g., United States v. Young*, 470 U.S. 1, 7, 105 S. Ct. 1038, 1042, 84 L. Ed. 2d 1 (1985) (holding that a prosecutor's unsolicited personal views on the evidence may be improper), the record in this case demonstrates that the jury based their determinations on the elements of the statutes as opposed to anything "implied by the prosecution," as Petitioner alleges. (Pet. 54, ECF

No. 1-2).  Moreover, a review of the charge to the jury reveals that the jury was properly

instructed as to all elements of these offenses, *see* (Trial Tr. 183:15 – 191:22, Jury Charge, App.

Rta19 – part 2, Mar. 27, 2002, ECF No. 9-91), and was also instructed that the attorneys'

"[a]rguments statements, remarks, opening arguments, [and] closing summations are not

evidence" (*Id.* at 150:23-24).  The jury is presumed to have followed the instructions given to it

by the trial judge.  *See Weeks v. Angelone*, 528 U.S. at 234.  Finally, this Court again notes the

substantial amount of evidence in this case establishing Petitioner's guilt which Petitioner,

himself, concedes existed with respect to the weapons offenses. (Pet. 54, ECF No. 1-2)

("Though, there was evidence to where a reasonable jury could find petitioner guilty of these

offenses, there was also evidence to the contrary."); *see also, e.g., United States v. Liburd*, 607

F.3d 339, 344 (3d Cir. 2010) (considering the weight of the properly admitted evidence against

the defendant in determining whether prosecutorial misconduct deprived defendant of a fair

trial).

Because the prosecutor's comments did not so infect the trial with unfairness as to deny

Petitioner of his right to a fair trial, this Court finds that the state court's rejection of Petitioner's

prosecutorial misconduct claim was not contrary to, or an unreasonable application of, Supreme

Court precedent.  Petitioner is not entitled to habeas relief on this ground.

   K.  <u>GROUND THIRTEEN:  The trial court improperly admitted hearsay testimony</u>

Petitioner's thirteenth claim for relief is divided into several sub-parts.  In support of this

claim, Petitioner relies on the argument set forth in his Petition, *see* (Pet. 56-70, ECF No. 1-2), as

well as the arguments set forth in the brief submitted in support of his direct appeal, *see*

(Appellate Brief 27-40, App. Ra7, June 15, 2005, ECF No. 9-11).  In sum, Petitioner asserts that

the trial court improperly permitted the State to elicit highly prejudicial testimonial hearsay

which violated Petitioner's rights under the Confrontation Clause and denied him of his right to a fair trial.

As explained above, generally, claims of state court error in the admission of evidence are not cognizable in a federal habeas proceeding.  A federal claim may be established, however, if the admission of evidence did not merely violate state law, but rose to the level of a deprivation of due process. *See Estelle*, 502 U.S. at 70.  "To rise to that level, such an error must have been so pervasive as to have denied Petitioner a fundamentally fair trial." *Richardson v. Ricci*, No. 10-4954, 2013 WL 3863994, at *9 (D.N.J. July 24, 2013) (citing *Keller v. Larkins*, 251 F.3d at 413); *see also Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir.) *cert. denied sub nom. Glenn v. Walsh*, 134 S. Ct. 2700, 189 L. Ed. 2d 744 (2014) (quoting *Riggins v. Nevada,* 504 U.S. 127, 149, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) ("To prevail on his due process claim, Glenn must prove that he was deprived of 'fundamental elements of fairness in [his] criminal trial.'"). Here, a review of the record reveals that, even assuming that evidence was improperly admitted, the error was not so egregious as to violate Petitioner's constitutional rights or otherwise deprive him of a fundamentally fair trial.

1.  Testimonial hearsay attributed to Ronald Patterson, Sr., admitted through testimony of Officer Mastrangelo

Officer Thomas F. Mastranglo was an officer with the Mount Holly Police Department at the time the crime at issue in this case occurred, and was one of the officers dispatched to the Gardens in response to a report that shots had been fired.  At trial, the State called Officer Mastrangelo to testify regarding the scene he witnessed that night.  Mastrangelo explained that, after arriving, he began to aid other officers in attempting to control the crowd.  Mastrangelo also stated that he saw the victim's father, Ronald Patterson, Sr., whom Mastrangelo knew from

previous encounters. (Trial Tr. 244:15-23, Testimony of Mastrangelo, App. Rta11 – part 2, Mar. 13, 2002, ECF No. 9-77).  Sadly, Ronald Patterson, Sr., was killed in an unrelated automobile accident prior to Petitioner's trial and, thus, was unavailable for cross-examination at trial. Nevertheless, over defense counsel's objections, the trial court permitted Mastrangelo to testify as to what Ronald Patterson, Sr., "blurt[ed] out" (*Id.* at 253:9) to him the night of the shooting:

> Mr. Patterson, while escorting him into the car, at that point, I was taking him by the elbow, he said to me Tone shot Bullet and ran down the alley way toward Rancocas Road and made a left into the alley behind 118 Joseph Place, that he was dressed in dark clothes with a lighter color shirt underneath.  Mr. Patterson, Sr. then stated that he saw the shooting and chased after Tone, that Tone was originally with Black and those boys at Bobby's house, indicating the end with a nod of his head and pointing at the end of Joseph Place.

(*Id.* at 253:13-23).

Petitioner asserts that admission of this hearsay testimony violated his Sixth Amendment Confrontation Clause rights under *Crawford v. Washington*, because he did not have a prior opportunity to cross-examine this witness. 541 U.S. 36.  In *Crawford*, Supreme Court held that the Sixth Amendment's Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant has had a prior opportunity for cross-examination." *Id.* at 53–54.  In this case, the state appellate court rejected Petitioner's *Crawford* argument on direct appeal:

> Burns argues that admission of that statement violated *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L. Ed.2d 177 (2004).  We disagree because the statement was neither formal nor testimonial, and clearly fell well within the excited utterance exception.  Moreover, we perceive no prejudice to Burns whatsoever.  The first part of the statement implicates only Felder, and the fact that Felder shot the victim in the manner described above was not in issue.  The second part of the statement implicates Burns, but only to the degree that he implicated himself by his admission at trial that he was with Felder and the others in front of Bryant's house before and at the time of the shooting.

*State v. Burns*, No. A-6273-01T4, 2006 WL 1275077, at *16.  The New Jersey Supreme Court denied certification of this issue. (Order Denying Certification, App. Ra17, Sept. 8, 2006, ECF

No. 9-21).   For the reasons that follow, this Court determines that the state court's rejection of this claim was not contrary to, or an unreasonable application of, existing Supreme Court precedent.

In *Crawford*, the Court declined to "spell out a comprehensive definition of 'testimonial,'" *id.*, 541 U.S. at 68, but provided guidance by giving examples of testimonial statements, *see id.* at 51-52.   In *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), the Supreme Court provided further clarification of what constitutes a testimonial statement in the context of a statement made to police:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822.

The common thread in *Crawford* and *Davis* is whether the statements were made with a future criminal prosecution in mind. *See id.*; *Crawford*, 541 U.S. at 51 (holding that an example of a testimonial statement is one that "declarants would reasonably expect to be used prosecutorially").

Here, it is evident that Ronald Patterson, Sr.'s statements were not testimonial in nature. The record shows that his statements to Officer Mastrangelo were made, informally and unprompted, while his son lay bleeding to death nearby. *See* (Trial Tr. 249:25 – 250:3, Testimony of Mastrangelo, App. Rta11 – part 2, Mar. 13, 2002, ECF No. 9-77) (Q: "So if I understand your testimony, you're not even really asking him questions or interviewing, he's just blurting things out?"  A: "That's correct."); (*Id.* at 253:24 – 254:3) (Q: "And this was all just something that he's just really blurting out to you as opposed to questions and answers?"  A:

"That's correct.  The[r]e was no questioning at that particular time of Mr. Patterson.").  Given these circumstances, it can hardly be argued that Ronald Patterson, Sr., made these statements with an eye toward future criminal prosecution.  The fact that the statements "identified the co-defendant as the shooter and placed [Petitioner] together with the co-defendant just prior to the shooting" does not automatically make them testimonial, as Petitioner alleges. (Pet. 64, ECF No. 1-2).  Rather, an objective analysis of Ronald Patterson, Sr.'s statements—which were made spontaneously during an ongoing traumatic event—indicates that they are not testimonial and, therefore, the Confrontation Clause is inapplicable. *See, e.g., Michigan v. Bryant*, 562 U.S. 344, 360, 131 S. Ct. 1143, 1156, 179 L. Ed. 2d 93 (2011) (holding that admission of out-of-court statements made by a mortally wounded victim to police officers, in which the victim identified defendant as the shooter and stated that the shooting occurred at the back door of defendant's house, did not violate the Confrontation Clause because the statements were "not procured with a primary purpose of creating an out-of-court substitute for trial testimony," but to determine whether an emergency that could threaten the police and the public at large was ongoing); *Davis v. Washington,* 547 U.S. 813 (holding that the admission of a victim's 911 call to the police, in which the victim identified the defendant as the perpetrator of an act of domestic violence, did not violate the Confrontation Clause because the evidence was not designed to prove "some past fact, but to describe current circumstances requiring police assistance).

Accordingly, the state appellate division's rejection of Petitioner's Confrontation Clause claim challenging the hearsay statements of Ronald Patterson, Sr., was not contrary to, or an unreasonable application of, Supreme Court precedent.  Petitioner is not entitled to habeas relief on this claim.

2. <u>Testimonial hearsay attributed to Tifani Young admitted through testimony of</u>

<u>Detective D'Ascentis</u>

As noted in the discussion rejecting Petitioner's Ground One, Petitioner had the

opportunity to cross-examine Tifani Young.  Therefore, for reasons already explained, there is no

violation of the Confrontation Clause. *See, e.g., United States v. Price*, 458 F.3d 202, 209 n.2 (3d

Cir. 2006) ("The instant case does not present any Confrontation Clause issues because the

challenged hearsay statements were made by Bonett, who testified at trial and was available for

cross-examination."); *Venegas v. Biter*, No. 12-1239, 2013 WL 5966350, at *20 (finding no

Confrontation Clause violation where the scope of cross-examination was not limited by the law

or by the trial court, but by the witness's simple refusal to testify).  Accordingly, the state court's

rejection of this claim was not contrary to, or an unreasonable application of, clearly established

federal law and Petitioner is not entitled to habeas relief on this claim.

L. <u>GROUND FOURTEEN:  Prosecutorial Misconduct in expressly asking Petitioner to</u>

<u>characterize the prosecution's witnesses as liars</u>

At trial Petitioner provided direct testimony which contradicted testimony given by a

number of the State's witnesses.  During his cross-examination of Petitioner, the prosecutor

repeatedly asked Petitioner to characterize the testimony of the State's other witnesses as lies.

*See* (Trial Tr. 68:19 – 85:14, Cross-Examination of Petitioner, App. Rta18 – part 1, ECF No. 9-

88).  In his fourteenth ground for relief, Petitioner asserts that this tactic was improper and

amounted to prejudicial prosecutorial misconduct which deprived him of his right to a fair trial.

Petitioner raised this issue on direct appeal, and although the state appellate division noted that

"[i]t is generally improper for one witness to be asked to assess another witness's credibility[,]"

it nonetheless was "satisfied that what occurred was not plain error." *State v. Burns*, No. A-6273-

81

01T4, 2006 WL 1275077, at *16 (citing *State v. Bunch*, 180 N.J. 534, 549, 853 A.2d 238, 246

(2004)).  The New Jersey Supreme Court denied certification of this issue. (Order Denying

Certification, App. Ra17, Sept. 8, 2006, ECF No. 9-21).

> In the instant Petition, Petitioner relies entirely on New Jersey state case law in support of

this claim. *See, e.g., State v. Bunch*, 180 N.J. at 549; *State v. T.C.*, 347 N.J. Super. 219, 238, 789

A.2d 173, 184 (App. Div. 2002).  However, as set forth above, claims based on errors of state

law are not cognizable on federal habeas review, and federal courts cannot re-examine state court

determinations on state law issues. *See Estelle v. McGuire*, 502 U.S. at 67–8.  Because Petitioner

does not cite to any Supreme Court precedent which stands for the proposition that this type of

questioning deprives a defendant of his right to a fair trial—and because this Court can find

none—this Court cannot determine that the state court's rejection of this claim was contrary to,

or an unreasonable application of, existing Supreme Court precedent.[22]  Petitioner is not entitled

to habeas relief on this claim.

> Moreover, even assuming that this claim presents an issue which is cognizable on federal

habeas review, this Court finds that Petitioner is not entitled to habeas relief.  As Respondents

point out, the jury was instructed several times that they were the ultimate judges of the

witnesses' credibility. *See, e.g.,* (Trial Tr. 150:15-17, Jury Charge, App. Rta19 – part 2, Mar. 27,

2002, ECF No. 9-91)  ("You and you alone are the sole and exclusive judges of the evidence,

and of the credibility of the witnesses . . .".).  The jury is presumed to have followed the

---

[22] This Court again notes that this line of questioning is inappropriate in the Third Circuit. *See United States v. Vitillo*, 490 F.3d 314, 325 (3d Cir. 2007), *as amended* (Aug. 10, 2007) (citing *United States v. Harris*, 471 F.3d 507, 511 (3d Cir. 2006) ("Today, we follow our sister circuits and hold that asking one witness whether another is lying is inappropriate.")).  However, as set forth above, the ultimate question on habeas review is whether the state court's holding is contrary to, or an unreasonable application of, existing Supreme Court precedent.  Therefore, Third Circuit case law is unhelpful to Petitioner's claim for habeas relief. *See, e.g., Lopez v. Smith*, 135 S. Ct. 1; *Parker v. Matthews*, 132 S. Ct. at 2155.

instructions given to it by the trial judge.  *See Weeks*, 528 U.S. at 234.  It was evident from the testimony presented at trial that Petitioner's version of the facts differed significantly from the versions presented by the State's witnesses.  Therefore, the prosecutor's questions, which served to highlight inconsistencies that were already apparent to the jury, was not so prejudicial as to deny Petitioner of his fundamental right to a fair trial.

Finally, this Court again notes the substantial amount of evidence establishing Petitioner's guilt.  Therefore, even if the Court were to assume that Petitioner's fourteenth claim for relief is cognizable on habeas review, Petitioner was not deprived of his right to a fair trial and this claim would be denied as meritless.  *See, e.g., State v. Bunch*, 180 N.J. 534 (finding no deprivation of right to fair trial in light of significant evidence against defendant and instruction to the jury regarding credibility of the witnesses); *State v. T.C.*, 347 N.J. Super. 219 (finding no deprivation of right to fair trial where prosecutor simply highlighted and emphasized inconsistencies in testimonies which were already apparent to the jury and where jury had been instructed on its responsibility to determine credibility of witnesses).

M. <u>GROUND FIFTEEN: Illegal sentence</u>

At sentencing, Petitioner's weapons conviction was merged into his murder conviction and he was sentenced to life in prison with thirty years of parole ineligibility.  In addition, he was sentenced to a five-year consecutive sentence on the conviction for hindering apprehension.  In his petition for PCR, Petitioner argued that his sentence was illegal.  In rejecting this claim, the PCR court stated that Petitioner "provides no legal support for that position.  Simply stated, the sentence was not illegal." (PCR Order 30, App. Ra26, Apr. 27, 2010, ECF No. 9-44).[23]

---

[23] This Court notes that Petitioner did not raise this claim in his appeal of the PCR court's decision; therefore, it appears to be unexhausted. *See State v. Burns*, No. A-1098-10T2, 2012 WL 1969934, at *2 (noting that Petitioner did not raise on appeal all of the arguments presented

In his fifteenth claim for relief, Petitioner again asserts that his sentence is illegal. (Pet. 84, ECF No. 1-2).  "A federal court's ability to review state sentences is limited to challenges based upon 'proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies.'" *Merritt v. Bartkowski*, No. 11-3756, 2013 WL 4588722, at *15 (D.N.J. Aug. 28, 2013) (quoting *Grecco v. O'Lone,* 661 F.Supp. 408, 415 (D.N.J 1987) (citation omitted)).  Thus, a challenge to a state court's discretion at sentencing is not reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation. *See Pringle v. Court of Common Pleas,* 744 F.2d 297, 300 (3d Cir. 1984). *See also* 28 U.S.C. § 2254(a); *Estelle,* 502 U.S. at 62, 67.

In the instant Petition, Petitioner relies on the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) and *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) in support of this claim.[24]  In *Apprendi*, the Supreme Court held that a jury must determine beyond a reasonable doubt any facts that increase a defendant's sentence beyond the statutory maximum. *Id.*, 530 U.S. at 490.  In *Blakely*, the Court held that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant, without any additional findings of facts. *Id.*, 524 U.S. at 303.

With respect to this claim, Petitioner first argues, generally, that the New Jersey statutes under which he was sentenced are unconstitutional.  He alleges that "N.J.S.A. 2C:44-1f(1) is

_____

to the PCR court).  Nevertheless, to the extent this claim is unexhausted, it will be denied on the merits pursuant to 28 U.S.C. § 2254(b)(2).

[24] Petitioner also cites to the decisions of New Jersey State courts in support of this claim. However, as explained earlier, claims based on errors of state law are not cognizable on federal habeas review, *see Estelle v. McGuire*, 502 U.S. at 67–8, and this Court's review is limited to whether there has been a violation of constitutional proportions.

unconstitutional because it authorizes a sentence in excess of the presumptive term in the absence of a jury findings beyond a reasonable doubt, and that N.J.S.A. 2C:44-5 is unconstitutional because it authorizes consecutive terms in the absence of jury findings beyond a reasonable doubt." (Pet. 87, ECF No. 1-2).  Petitioner then challenges these statutes as applied to his sentence, and asserts that he received consecutive sentences in excess of the presumptive terms, in violation of his constitutional rights.

As an initial matter, Petitioner's general argument that the statutes under which he was sentenced are unconstitutional is without merit.  First, Petitioner does not cite to any Supreme Court precedent—and this Court has found none—which declares the statutes in question unconstitutional.  Next, even accepting as true Petitioner's allegation that N.J. STAT. ANN. 2C:44-1(f) "authorizes a sentence in excess of the presumptive term in the absence of a jury findings beyond a reasonable doubt, and that N.J. STAT. ANN. 2C:44-5 . . . authorizes consecutive terms in the absence of jury findings beyond a reasonable doubt[,]" these statutes do not violate the Supreme Court's holdings in the *Apprendi* line of cases.  To be clear, the *Apprendi* line of cases apply to situations where a defendant's sentence exceeds the statutory maximum, *see id.*, 530 U.S. at 490, and do not make reference to a presumptive term.[25]

For these same reasons, Petitioner's more specific argument that his sentence is illegal is denied as meritless.  Petitioner contends that the "presumptive term" for his murder conviction should have been 30 years, *see* (Pet. 94-95, ECF No. 1-2), and the "presumptive term" for his hindering apprehension conviction should have been 4 years, *see* (*id.* at 93).  He further asserts

---

[25] The New Jersey Supreme Court's holding in *State v. Natale*, 184 N.J. 458, 484, 878 A.2d 724, 739 (2005)—which abolished the use of "presumptive terms" in order to reconcile the State's sentencing scheme with the Supreme Court's decisions in the *Apprendi* line of cases—is unhelpful to Petitioner on federal habeas review.  As the decision of a state court, *Natale* cannot serve as the basis for federal habeas relief.

that any sentence imposed in excess of those presumptive terms, without additional factual findings by a jury, denied him of his right to a trial by jury and due process. Petitioner's assertion that he "has the right to have a jury, not a judge, make the aggravating-factors findings (other than prior record)" demonstrates a clear misunderstanding of the law and of the holdings in *Apprendi* and its progeny.

As explained above, the *Apprendi* line of cases only require additional findings of fact by a jury where the sentence imposed exceeds the statutory maximum. Here, the maximum sentence for Petitioner's conviction of murder pursuant to N.J. STAT. ANN. § 2C:11-3(a) was life imprisonment. *See* N.J. STAT. ANN. § 2C:11-3(b). And the maximum sentence for Petitioner's conviction of third degree hindering apprehension pursuant to N.J. STAT. ANN. 2C:29-3a(2) was five years. *See* N.J. STAT. ANN. § 2C:43-6(a)(3) ("In the case of a crime of the third degree, for a specific term of years which shall be fixed by the court and shall be between three years and five years"). Because neither of Petitioner's sentences exceeded the statutory maximum, the sentencing judge properly considered the aggravating factors to determine an appropriate sentence, and no additional findings were required by a jury. Accordingly, Petitioner's sentences are not illegal or in violation of the *Apprendi* line of cases and the state court's rejection of this claim was not contrary to, or an unreasonable application of, Supreme Court precedent.[26]

---

[26] This Court reiterates that Petitioner's reliance on the New Jersey Supreme Court's holding in *State v. Natale,* 184 N.J. 458, does not entitle him to habeas relief. As stated earlier, the decision of a state supreme court is not determinative of an issue on federal habeas review. Moreover, in *Natale,* the New Jersey Supreme Court held that "a sentence above the presumptive statutory term based solely on a judicial finding of aggravating factors, other than a prior criminal conviction, violates a defendant's Sixth Amendment jury trial guarantee." *Natale,* 184 N.J. at 466. Although Petitioner's sentence for his hindering apprehension conviction exceeded the presumptive term for a third degree offense, this sentence was based on aggravating factors (3), (6), and (9)—all of which relate to Petitioner's prior convictions. (Sentencing Tr. 48:11-12, App. Rta21, June 14, 2002, ECF No. 9-93). Because it was based on Petitioner's prior criminal convictions, his sentence on this offense in excess of the presumptive term does not run afoul of the New Jersey Supreme Court's holding in *Natale.* Further, because Petitioner has not provided

Finally, to the extent Petitioner asserts that factual findings by a jury are required before a court may impose consecutive sentences, this claim is denied as meritless.  Nothing in the *Apprendi* line of cases—or any other Supreme Court case—imposes such a requirement.

For the foregoing reasons, the PCR court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law and Petitioner is not entitled to habeas relief on Ground Fifteen.

N. <u>GROUND SIXTEEN: Improper jury instruction as to accomplice liability.</u>

As his final ground for habeas relief, Petitioner again contends that the jury instruction with respect to accomplice liability deprived him of his right to a fair trial.  Respondents assert that this claim is unexhausted.  Indeed, on direct appeal Petitioner challenged the jury instructions specifically with respect to the lesser included offenses and did not present a challenge to the accomplice liability charge, in general, as he does in this Petition.  Therefore, this claim appears to be unexhausted.  Nevertheless, this claim will be denied on the merits. *See* 28 U.S.C. § 2254(b)(2).

> During trial, the jury was instructed:
>
> An accomplice may be convicted on proof of the commission of a crime or of his complicity in the crime even though the person who committed the crime, in this case, Tony Felder, has been convicted of a different offense or degree of an offense.
>
> In order to convict Mr. Burns as an accomplice to the murder of Ronald Patterson, Jr., you must find that Ronald Burns had the purpose to participate in that particular crime.  He must act with the purpose of promoting or facilitating the commission of the substantive crime with which he is charged.  It is not sufficient to prove only that the defendant had knowledge that Tony Felder was going to

---

conclusive support for his assertion that the presumptive term for a murder conviction is 30 years, he has failed to establish that his life sentence on that offense is in excess of the presumptive term.

commit the crime charged.  The State must prove that it was Mr. Burns's [sic] conscious object that the specific conduct charged be committed.

In conclusion, in order to find Mr. Burns guilty of committing the crime of murder as an accomplice, the State must prove the following elements beyond a reasonable doubt:  That Tony Felder committed the crime of murder; that Mr. Burn's [sic] purpose was to promote or facilitate the commission of the crime; that the defendant solicited him to commit it; and/or did aid or agree or attempt to aid him in planning or committing it; and that the – *this defendant possessed the criminal state of mind that is required to be proved against a person who actually committed the criminal act.*

(Trial Tr. 176:5 – 177:7, Jury Charge, App. Rta 19 – part 2, Mar. 27, 2002, ECF No. 9-91) (emphasis added).

Petitioner takes issue with the highlighted portion of these instructions and argues that the instruction "relieved the prosecution of it[s] burden of proving petitioner committed murder via the principle's intent . . ." (Pet. 104, ECF No. 1-2).  Specifically, Petitioner asserts that whether he possessed the state of mind necessary to convict a person who actually committed the criminal act is a different inquiry than whether he "shared the same mental state" as the shooter. (*Id.* at 103-104) (citing *State v. Bielkiewicz*, 267 N.J. Super. 520).  However, Petitioner's argument is self-defeating.  These are not two separate standards, but two different phrasings of the same concept.  The jury was adequately informed that the State was required to prove that Petitioner had the same state of mind as the person who actually committed the criminal act—in other words, that he shared the same mental state as the shooter.  The instruction is not ambiguous and did not serve to relive the State of its burden of proof with respect to the murder charge. *See Waddington v. Sarausad*, 555 U.S. 179, 190-91, 129 S. Ct. 823, 172 L. Ed. 2d 532 (2009) (holding that, to succeed on a claim of an unconstitutional jury instruction, a petitioner "must show both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every

element of the crime beyond a reasonable doubt.").  Petitioner is not entitled to habeas relief on this claim.

## V.      CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Applying this standard, this Court finds that a certificate of appealability shall not issue in this case.

## VI.      CONCLUSION

For the foregoing reasons, Petitioner's habeas petition will be denied and a certificate of appealability shall not issue.

An appropriate order will be entered.

DATED:  March 22, 2016

                                        s/Robert B. Kugler
                                        ROBERT B. KUGLER
                                        United States District Judge